STATE of Wisconsin, Plaintiff-Respondent,

v.

Barbara G. HOFFMAN, Defendant-Appellant.†

Court of Appeals

*No. 80–1224–CR. Argued October 28, 1981.*
*—Decided January 26, 1982.*
(Also reported in 316 N.W.2d 143.)

† Petition to review denied.

188

For the defendant-appellant there were briefs by *Donald S. Eisenberg,* and *Morris D. Berman,* and *Eisenberg, Giesen, Ewers & Hayes, S.C.,* of Madison, and oral argument by *Donald S. Eisenberg.*

For the plaintiff-respondent there was a brief by *Bronson C. La Follette,* attorney general, and *Thomas J. Balistreri,* assistant attorney general, and oral argument by *Thomas J. Balistreri,* assistant attorney general.

Before Gartzke, P.J., Bablitch, J. and Dykman, J.

DYKMAN, J.   Harold Berge died of cyanide poisoning on December 22, 1977. Defendant was charged with murdering him. A preliminary hearing was held on February 16, 1978, at which Gerald Davies testified against defendant. Davies died of cyanide poisoning on March 23, 1978. Defendant was subsequently charged with murdering Davies, and the two charges were tried together. Both counts alleged first-degree murder. The jury found defendant guilty of murdering Berge, and not guilty of murdering Davies. Defendant appeals from the judgment of conviction. We affirm.

Gerald Davies testified at a preliminary hearing that defendant called him on December 23, 1977, and asked

if he would like to see her. Davies picked her up that evening and they returned to her apartment at about 9:30 p.m. where they both fell asleep watching television. Davies awoke at about 2:00 a.m., and awakened defendant. She told him she had something to talk about and asked him to stay, but slept for another hour. When she again awoke, she told Davies she had found a dead body in her apartment when she returned from work on December 22.[1] The body looked as though it had been beaten. Defendant told Davies that she had moved the body, but it was "too close."

Davies testified that he left defendant's apartment at about 4:00 a.m., got his car, and parked it in the alley behind the apartment. Defendant dragged a body from behind a snowbank in the parking lot. Davies helped her lift it into the back seat of his car. They then drove to the Blackhawk Ski Club, where they placed the body in a snowbank and attempted to conceal it. After returning to her apartment, defendant gave Davies some corn starch and spot remover and suggested that he clean his car and clothing. She also told him it would be better if he tried to forget what happened.

Davies went to the Madison Police Department on December 25, 1977, and related these events to a detective. The body was recovered and determined to be that of Harold Berge. The pathologist who performed the autopsy on Berge formed the initial opinion that he died from blunt force trauma to the head.

In October of 1977, Berge had named Linda Millar (a name occasionally used by defendant) beneficiary of two life insurance policies and had executed a deed creating a joint tenancy between himself and Linda Millar in property that had been in his name alone.

---

[1] Although Davies testified that defendant told him she had discovered the body on December 21, he concluded that she meant she discovered the body on December 22.

Davies had purchased a $750,000 insurance policy from Transport Life Insurance Company with coverage effective March 12, 1977. Davies' estate was initially made the policy's beneficiary, but he named defendant beneficiary and transferred ownership of the policy to her in May 1977. Premiums on the policy were in excess of $12,000 per year. The first two semi-annual premiums were paid, but the third was not. Transport Life received defendant's personal check for the third premium, but she stopped payment on that check. The policy lapsed about a month before Davies' death.

Davies also had insurance policies from Central Life Assurance Co. that provided coverage totalling $35,000 in case of accidental death. Davies made defendant beneficiary and owner of these policies on March 10, 1978.

A complaint was filed on January 18, 1978, charging defendant with the first-degree murder of Berge. Defendant was bound over after a preliminary hearing.

Gerald Davies was found dead in his bathtub on March 27, 1978. The same pathologist that examined Berge's body concluded that Davies died of cyanide poisoning on the evening of March 25. That conclusion led the pathologist to reconsider the cause of Berge's death. Subsequent tests revealed that Berge had also died of cyanide poisoning.[2]

Defendant moved to remand for a second preliminary hearing to determine whether new evidence vitiated the finding that probable cause existed to bind over defendant. In addition to the new information regarding the

---

[2] The pathologist testified at trial that people who are poisoned with cyanide frequently suffer from convulsions, and that thrashing about during the convulsions could have produced the abrasions found on Berge's head. The pathologist further testified that the abrasions could also have been caused by a beating. He indicated that either explanation of the abrasions that caused him to conclude initially that the cause of death was blunt force trauma would be speculative.

cause of Berge's death, the motion was based on a letter written by Davies which stated that defendant had nothing to do with Berge's body.[3] The motion to remand was granted. The state subsequently dismissed the complaint against defendant and filed a new complaint charging her with the murders of Berge and Davies.

William Garrott testified at trial that defendant told him she was going to marry a man, take him to Mexico and kill him with botulism in order to collect $750,000 in insurance proceeds. Garrott said he saw a marriage license and a passport on a bulletin board in defendant's apartment. Records were introduced indicating defendant had applied for a marriage license and made an appointment to be married to Davies in April 1977.

Evidence was introduced at trial showing that chemical supplies were mailed at various times from a pharmaceutical firm to Davies at his and defendant's addresses. Those supplies could be used to grow the organism that causes botulism, as well as a variety of other bacteria. The supplies also included potassium cyanide, which was delivered to Davies at his address on May 16, 1977. The cyanide was purchased with Davies' check.

Defendant's father testified that he arrived at defendant's apartment in the early evening of December 22,

---

[3] The letter was postmarked March 25, 1978 and was sent to defendant's attorney, the Wisconsin State Journal, and the district attorney's office. The letter stated:

I want to write these letters because I want to set the record straight. I was scared, I was jealous, Barb is innocent and I wrecked her life. All those stories I told about Barb are false. She never had anything to do with a body at all. She never did. I went crazy, I was so scared, the police scared me. I was crazy and I didn't know what I was saying. Then I had to keep telling the same story or they would charge me with a crime. Now they did it to Barb instead and I don't know what to do anymore except tell the truth. I'm not crazy anymore and I'm not scared. I want to tell the truth, I'm not afraid of going to jail. Barb never had anything to do with a body at all. I swear it and they can do what they want to me.

1977, and stayed with her until they left for Illinois on the morning of December 24. Defendant's parents both testified they were with defendant at her apartment from noon on March 25, 1978 to about 6:00 p.m. on March 26. Defendant's mother testified that they went to sleep at about 10:00 or 11:00 p.m. on March 25, that she heard no talking, and that nothing disturbed her sleep although she is a light sleeper. Telephone records indicated that three long distance calls were made from defendant's apartment after midnight on March 26.

Defendant raises the following issues on appeal:

1. Should the complaint have been dismissed: (a) for lack of new evidence to recharge defendant with Berge's murder; (b) for lack of probable cause; (c) because it was supported by untrue allegations?

2. Was a John Doe proceeding abused?

3. Should the two counts have been severed before trial?

4. Did the production of bank records at trial violate the fourth amendment of the United States Constitution and deny defendant her right of discovery?

5. Was defendant's cross-examination of Garrott improperly restricted?

6. Did the state commit prejudicial error in its closing argument by: (a) misstating the evidence; (b) using defendant's phone bill for an impermissible purpose; (c) arguing from defendant's phone bill despite its failure to provide her with reciprocal discovery after receiving her notice of alibi; (d) commenting on the pretrial silence of her parents?

## I.  Motions to Dismiss Complaint

### A.  Reissuance of complaint

After the true cause of Berge's death was discovered and Davies' letter was received by defendant's attorney,

defendant moved to remand for a new preliminary hearing to determine whether there was still probable cause for a bindover. Judge Jones ruled that probable cause for a bindover was shown at the preliminary, and that the new evidence did not affect the validity of that determination.[4] He held, however, that defendant was entitled to notice of the means, manner, or circumstances of the killing during the preliminary stages of the case. Judge Jones believed that defendant had no notice of the cause of Berge's death that the state would attempt to prove, and that such lack of notice deprived the court of personal jurisdiction. He held that the error could be cured upon remand for a new preliminary hearing, and remanded the case for that purpose.

The state subsequently dismissed its complaint against defendant, and issued a new complaint on the same day charging her with the murders of Berge and Davies. The true cause of Berge's death was alleged in the new complaint.

Defendant contends that recharging her was improper without bringing forth new or unused evidence that would tend to establish her guilt. Assuming Judge Jones' ruling concerning jurisdiction to be correct, we conclude the state was not required to bring forth additional evidence in order to recharge defendant.[5]

Section 970.04, Stats., states: "If a preliminary examination has been had and the defendant has been discharged, the district attorney may file another complaint

---

[4] Defendant asserts that "[i]n effect, Judge Jones found a lack of probable cause for the bind-over for trial . . . ." The clear language of Judge Jones' memorandum decision belies that assertion.

[5] The state disagrees with Judge Jones' decision but does not challenge that ruling on appeal. We therefore do not decide whether Judge Jones was correct in holding that insufficient notice of the cause of death deprived the court of personal jurisdiction.

if he has or discovers additional evidence." This statute forbids reissuance of a complaint if the evidence presented at a preliminary hearing was insufficient, unless the state comes forward with new or previously unused evidence. *Wittke v. State ex rel. Smith,* 80 Wis. 2d 332, 340, 259 N.W.2d 515, 518 (1977) ; *State v. Antes,* 74 Wis. 2d 317, 323, 246 N.W.2d 671, 674 (1976). Those cases do not address the situation in which dismissal is pursuant to the state's motion after probable cause was established at the preliminary hearing.

The policy underlying the rule of *Wittke* and *Antes* militates against its extension to the facts of this case. That policy is one which favors finality of judicial decisions and conservation of judicial resources, while protecting an individual from being "twice vexed for the same cause." Thus, where "the existence of probable cause has been fully litigated [and] proceedings have culminated in a final order of dismissal," the state should not be permitted a second kick at the cat unless there is "additional evidence to support a different result." *Wittke,* 80 Wis. 2d at 342, 259 N.W.2d at 519. "The vexation and harassment contemplated in [*Wittke*] is that which results from repeated attempts to establish probable cause upon evidence which has already been found, and is likely to continue to be found, insufficient." *State v. Braunsdorf,* 98 Wis. 2d 569, 578, 297 N.W.2d 808, 812 (1980).

Although the issue of probable cause was fully litigated during the first preliminary, that proceeding culminated in a bindover rather than a final order of dismissal. This case is not one in which the evidence was found, and probably would again be found, to be insufficient to establish probable cause for a bindover. The state did not seek to accomplish at a second preliminary what it was unable to accomplish at the first. Nor is there any suggestion that the second preliminary

was employed by the state as an instrument of harassment. *See State v. Brown,* 96 Wis. 2d 258, 266–67, 291 N.W.2d 538, 542 (1980). Defendant was therefore not "twice vexed for the same cause"; rather, she was given a second opportunity to avoid bindover, which is exactly the relief she requested in her motion. We perceive no reason to apply the rule of *Wittke* and *Antes* to these facts.

We find support for our holding in *Brown, supra.* The preliminary hearing in *Brown* had "degenerated into a disorderly and unruly proceeding" and was dismissed for that reason before a finding as to probable cause was made. *Brown,* 96 Wis. 2d at 270, 291 N.W.2d at 544. The court noted that the dismissal was not intended to give the state the opportunity to obtain a more favorable ruling at a second preliminary, and that the policy favoring repose was therefore less strong than in the case in which a probable cause determination had been made. *Id.* By like reasoning, when probable cause has been established at a preliminary, there is no strong argument for barring the state from recharging.

We conclude that in this case the state was not barred from recharging defendant, whether or not it had new evidence.

*B.    Probable cause*

Defendant argues that the new complaint did not state probable cause to believe defendant murdered Berge. A criminal complaint is a self-contained charge which must set forth facts that are sufficient, in themselves or together with reasonable inferences to which they give rise, to allow a reasonable person to conclude that a crime was probably committed and that the defendant is probably culpable. *State v. Olson,* 75 Wis. 2d 575, 580–

81, 250 N.W.2d 12, 15 (1977) ; *State ex rel. Evanow v. Seraphim,* 40 Wis. 2d 223, 226, 161 N.W.2d 369, 370 (1968).

We are to use a "common sense" rather than a "hyper-technical" approach to determine whether the complaint is minimally adequate in stating the essential facts that establish probable cause. *Olson,* 75 Wis. 2d at 581, 250 N.W.2d at 15–16. A complaint meets this test if it answers the following five questions: "(1) Who is charged?; (2) What is the person charged with?; (3) When and where did the alleged offense take place?; (4) Why is this particular person being charged?; and (5) Who says so? or How reliable is the informant?" *State v. White,* 97 Wis. 2d 193, 203, 295 N.W.2d 346, 350 (1980).

The complaint easily answers the first two questions. It charges defendant, Barbara Hoffman, with the first-degree murder of Harold Berge.[6]

Defendant argues the complaint fails to allege when the offense took place. The complaint states that Berge was observed eating a meal at work at about 7:45 p.m. on December 22, 1977, and that he left work at 8:00 p.m. The remains of that meal were found in Berge's stomach during the autopsy. The pathologist determined that Berge died one to one and a half hours after eating the meal. That places the time of death at about 8:45 to 9:15 p.m. on December 22. Berge was therefore probably poisoned between 8:00 and 9:15 p.m. on that day. "Generally, where time of commission of a crime is not a material element of the offense charged, it need not be precisely alleged." *Blenski v. State,* 73 Wis. 2d 685, 696,

---

[6] Although the complaint also charges the murder of Davies, and defendant's brief suggests the complaint did not establish probable cause on that count, her acquittal of that crime renders that point moot.

245 N.W.2d 906, 912 (1976). *See also Thomas v. State,*
92 Wis. 2d 372, 386, 284 N.W.2d 917, 925 (1979) ("fail-
ure to prove the specific date of the offense is not fatal
to the state's case against the defendant"). We conclude
that the time of the offense was sufficiently stated.

Defendant also contends the complaint fails to allege
the location of the offense. The complaint states Berge
left work at Stoughton at 8:00 p.m. on December 22 and
that he said he was going to Madison. He probably died
within 1½ hours after leaving work and his body was
found in Madison in the early hours of December 24.
The offense therefore probably occurred in Madison, and
there is reason to believe it happened in defendant's
apartment since that is where she said she found the
body. The exact location of the offense need not be al-
leged if it is not a material element of the offense; "an
allegation that an offense was committed in a specified
town in a specified county is a sufficient description of
place." 2 *Wharton's Criminal Procedure* sec. 275 at 88
(12th ed. 1975). The exact location of a murder will
often be known only to the murderer if the body is there-
after moved. We conclude that the facts stated in the
complaint sufficiently state the location of the crime.

Defendant argues that the complaint does not state
why defendant was charged with the offense. The com-
plaint states that defendant concealed Berge's dead body
with the help of Davies. Concealment of evidence, includ-
ing "hiding decedent's body," permits an inference of
consciousness of guilt. 3 *Underhill's Criminal Evidence*
sec. 655 at 1586-87 (5th ed. 1957). The complaint also
alleges that Berge recently named Linda Millar the bene-
ficiary of insurance policies, and made her joint tenant
with himself in a piece of property. The complaint con-
nects the name Linda Millar to defendant. It thus states

a motive which strengthens the inference that defendant was the guilty party. *Wittig v. State,* 235 Wis. 274, 280, 292 N.W. 879, 882 (1940). Finally, the complaint alleges that defendant had discussed a plan to poison Davies. Davies and Berge both died of cyanide poisoning and both had named defendant as beneficiary of insurance policies. Defendant's reported statement that she intended to poison Davies makes it probable that she committed that crime. The similarities between the deaths of Davies and Berge permit the inference that the same person committed both crimes. *Sanford v. State,* 76 Wis. 2d 72, 79, 250 N.W.2d 348, 351 (1977).

■

The complaint need not establish defendant's guilt beyond a reasonable doubt.

The complaint is the first of many steps in a criminal prosecution. Its essential function is informative, not adjudicative. "It is enough that a fair-minded magistrate could conclude that the facts and circumstances alleged justify further criminal proceedings and that the charges are not merely capricious."

*Olson,* 75 Wis. 2d at 583, 250 N.W.2d at 17 (citation omitted). We conclude that the complaint sufficiently explains why defendant was charged with the crime.

All sources of information contained in the complaint are identified and the reliability of the sources is explained. We therefore conclude that the complaint adequately states the source of the allegations.

■

Defendant asserts that the complaint states no facts that would permit an inference that defendant intended to cause Berge's death. Direct proof of intent is rare. *Clark v. State,* 62 Wis. 2d 194, 197, 214 N.W.2d 450, 451 (1974). Intent can, however, be inferred from the circumstances and from one's acts. *Johnson v. State,* 85 Wis. 2d 22, 32, 270 N.W.2d 153, 158 (1978). Defendant's

motive to commit the crime, her concealment of the corpse, and the cause of death permit an inference of intent.

We conclude that the complaint states probable cause.

## C. *Truthfulness of complaint*

Defendant contends that there are false statements in the factual portion of the complaint which warrant its dismissal.

Misstatements of fact in an affidavit in support of a search warrant may void the warrant.

[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). The *Franks* holding was discussed in the context of a criminal complaint in *State v. Marshall*, 92 Wis. 2d 101, 112–13, 284 N.W.2d 592, 596–97 (1979).

*Franks* requires a false allegation to be struck only if made deliberately or with reckless disregard for the truth. A negligent or innocent mistake is insufficient to trigger the *Franks* remedy. *Franks*, 438 U.S. at 171. Defendant urges us to follow the lead of the California Supreme Court in extending the *Franks* holding. In *People v. Cook*, 583 P.2d 130 (Cal. 1978), the court held that factual errors which are innocently made need not be ex-

cised from an affidavit in support of a warrant. If falsehoods are negligently stated, however, striking them from the complaint furthers the goal of deterring such negligence. The court therefore required excision of such statements and reevaluation of the affidavit to determine whether it states probable cause in the absence of the false facts. *Cook*, 583 P.2d at 137. The court further held that the warrant must be voided if it is supported in any part by intentionally or recklessly false statements.

We need not decide whether *Cook* states the law to be followed in Wisconsin. We find no evidence in the record sufficient to make a preliminary showing that intentionally or recklessly false statements were included in the complaint. Striking those allegations which defendant claims to be false does not alter our holding that the complaint states probable cause.

The complaint states that Dr. Bruce Selman advised detectives that "cyanide was missing and presumed stolen from his chemical stores in his laboratory . . . ." Defendant's affidavit in support of her motion for a *Franks* hearing states that Dr. Selman did not tell the police that the cyanide was presumed stolen. He said he ordered a bottle of cyanide, his department apparently received the bottle, and it is now missing. Dr. Selman does not know whether the bottle was stolen, was used by himself and others, or was never actually delivered. We find no hint of a deliberate or reckless false statement of facts in this portion of the complaint. The officer may have inserted his own presumption regarding whether the cyanide was stolen, but a presumption, whether the affiant's or Dr. Selman's, is not a fact. The *fact* stated in the complaint is that cyanide ordered was missing. That fact is undisputed. No showing of an intent to deceive has been made.

The complaint states that Professor Nelson indicated that he had discussed cyanide in at least two lectures in

a class in which defendant was enrolled. Professor Nelson allegedly said cyanide is "a classic example of how a toxic substance can disrupt and interfer[e] with the normal functioning of the human organism." Defendant asserts in her affidavit that Professor Nelson did not refer to cyanide as a "toxic substance" and that he discussed it in terms of all organisms, not humans in particular. Common knowledge instructs that cyanide is toxic and that humans are organisms. Defendant's affidavit indicates that Professor Nelson said that cyanide blocks the production of energy and impairs the normal functioning of organisms. At best, defendant has indicated that Professor Nelson was innocently or negligently misquoted, but there is no indication that the paraphrased statements made in the complaint are false or made with intent to deceive.

The complaint states that David Smith stated he observed defendant in the biochemistry building "on several occasions during the summer of 1977." Defendant's affidavit states that Smith told the police he thought it was the summer of 1977. At some time after he spoke to the police, he concluded he was wrong. There is no indication that his statement to the police was in any way misstated in the complaint.

Defendant has pointed to only two relatively insignificant possible misstatements in an eight page rendition of facts in support of probable cause. Neither misstatement has a bearing on probable cause. Absent a pattern of deception throughout the complaint, or deception as to key facts that would have strengthened the complaint, and absent facts to show the affiant knew he was deceiving the court, we cannot conclude that defendant has made a preliminary showing of intentional deception on the part of the affiant. There is therefore no reason to disbelieve the remaining allegations in the complaint. We do not rely on the challenged facts in concluding that

probable cause was established by the complaint. Even if all the challenged statements were found to be false and negligently made, therefore, and we applied the *Cook* analysis to strike them from the complaint, our holding that the complaint states probable cause would remain unchanged.

Defendant's motion to dismiss was properly denied.

## II.  John Doe Investigation

A John Doe investigation into the death of Gerald Davies was commenced after defendant had been charged with Berge's murder. William Garrott testified at the John Doe. A substantial portion of his testimony consisted of his recollection of a discussion he had with defendant in which defendant told him she had found Berge's body in her apartment, that she dragged it down the stairs but was unable to lift it into a car, and that she later moved it with help from a friend.

A John Doe investigation is "limited to the subject matter of the complaint upon which the John Doe is commenced." *State v. Washington,* 83 Wis. 2d 808, 822, 266 N.W.2d 597, 604 (1978). The John Doe confers investigative powers on law enforcement officers which are otherwise unavailable, including "the power to subpoena witnesses, to take testimony under oath, and to compel the testimony of a reluctant witness." *Washington,* 83 Wis. 2d at 822–23, 266 N.W.2d at 604. The John Doe judge must limit the use of these powers and the scope of the investigation "with a view toward issuing a complaint or determining that no crime has occurred. To the extent that the judge exceeds this limitation, there is an abuse of discretion." *Washington,* 83 Wis. 2d at 823–24, 266 N.W.2d at 605.

The implication is plain that when said facts [that the accused and any other person or persons are probably guilty of the offense] appear to the magistrate his duty is to issue the proper warrant. *Certainly where he issues a warrant he cannot continue a hearing as an aid to the district attorney in preparing the prosecution.*

*Washington,* 83 Wis. 2d at 824, 266 N.W.2d at 605, quoting with approval *State ex rel. Kowalski v. District Court,* 254 Wis. 363, 375, 36 N.W.2d 419, 426 (1949) (Hughes, J., dissenting) (emphasis supplied).

Although the supreme court expressly held in *Washington* that the John Doe is not to be used as a discovery tool to aid the prosecution after a complaint has been issued, no reported Wisconsin cases have established when such an abuse can be said to occur, or what its remedy should be. A similar rule against using a proceeding to assist the government in preparing a pending prosecution applies to federal grand juries. *United States v. Gibbons,* 607 F.2d 1320, 1328 (10th Cir. 1979) ; *United States v. Doss,* 545 F.2d 548, 552 (6th Cir. 1976). We have noted that a John Doe investigation "functions as a one-man grand jury . . . ." *In re Wis. Family Counseling Services v. State,* 95 Wis. 2d 670, 676, 291 N.W.2d 631, 635 (Ct. App. 1980). We therefore consider cases applying the rule in the context of the federal grand jury to be instructive in resolving this issue.

Federal courts have held that a grand jury may inquire into matters which are the subject of a pending prosecution so long as that is not the dominant or primary purpose of the inquiry.

[I]t is improper to use the grand jury for the primary purpose of strengthening the Government's case on a pending indictment or as a substitute for discovery, although this may be an incidental benefit. However, where there is another legitimate purpose behind the

grand jury investigation, the proceeding would not be improper merely because the Government may derive an incidental benefit.

*Gibbons,* 607 F.2d at 1328 (citations omitted). *See also United States v. Woods,* 544 F.2d 242, 250 (6th Cir. 1976), *cert. denied,* 430 U.S. 969 (1977) ; *United States v. Sellaro,* 514 F.2d 114, 122 (8th Cir. 1973), *cert denied* 421 U.S. 1013 (1975) ; 8 *Moore's Federal Practice* ¶ 6.04 [5] at 6–86 (1981).

A writ of prohibition may issue to prevent the John Doe investigation from exceeding its lawful scope. *State ex rel. Niedziejko v. Coffey,* 22 Wis. 2d 392, 402, 126 N.W.2d 96, 101 (1964). If no such writ is issued and testimony is received for the dominant purpose of gathering evidence for use in a pending prosecution, "the only effective remedy is to prohibit the government from profiting in any way from the calling of [the witness] before the grand jury." *United States v. Kovaleski,* 406 F. Supp. 267, 271 (E.D. Mich. 1976). Suppression of the witness' testimony and its fruits is therefore an appropriate remedy.

We need not decide if the primary or dominant purpose of calling Garrott as a witness at the John Doe was to gather evidence to assist in the prosecution of defendant's pending murder prosecution. If that were the case, suppression of Garrott's testimony as it related to Berge's death would have been the appropriate remedy. The exclusion of that testimony was apparently voluntarily undertaken by the state. Garrott's testimony on direct examination at trial referred only to his discussion with defendant regarding her plot to kill Davies with botulism. Garrott was asked a few questions about Berge on cross-examination and those questions were to some extent fol-

lowed up on redirect, but Garrott at no time testified about defendant's discovery of Berge's body in her apartment or the events which followed. We conclude that the state's voluntary exclusion of this evidence provided the same remedy to which defendant would have been entitled had she established that the John Doe investigation was abused. We accordingly hold she has shown no prejudice from the alleged abuse and no reversible error occurred.[7]

### III. Severance

Section 971.12, Stats., provides in relevant part:

(1) Two or more crimes may be charged in the same complaint . . . in a separate count for each crime if the crimes charged . . . are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan. . . .

. . . .

(3) If it appears that a defendant or the state is prejudiced by a joinder of crimes . . . in a complaint . . . or by such joinder for trial together, the court may order separate trials of counts . . . or provide whatever other relief justice requires. . . .

---

[7] Defendant argues that Garrott's testimony regarding Davies was taken at the John Doe and introduced at trial for the dominant purpose of convicting defendant of Berge's murder. The John Doe conducted before Judge Bartell was an investigation into Davies' death. Garrott's testimony regarding defendant's alleged plot to kill a man for $750,000 in insurance proceeds properly furthered that investigation. This testimony may have conferred an incidental benefit on the state by adding weight to its theory of why defendant killed Berge. Receipt of this testimony at the John Doe for a legitimate purpose does not render the proceeding improper simply because the state obtained an incidental benefit from it with regard to a pending prosecution. *United States v. Gibbons*, 607 F.2d 1320, 1328 (10th Cir. 1979).

Defendant appears to contend that the two counts of murder were misjoined, and that the court abused its discretion in denying her motion for severance. The issues of misjoinder and severance are analytically distinct. *State v. Bettinger*, 100 Wis. 2d 691, 694, 303 N.W.2d 585, 587 (1981); *United States v. Werner*, 620 F.2d 922, 926 (2nd Cir. 1980). We therefore treat them separately.

### A. Misjoinder

Whether crimes were properly joined in a complaint is a question of law. *Werner*, 620 F.2d at 926.[8] The joinder statute is to be construed broadly in favor of initial joinder. *Francis v. State*, 86 Wis. 2d 554, 558, 273 N.W. 2d 310, 312 (1979).

Judge Boll ruled that the two counts were of "the same or similar character" because they both charged the crime of first-degree murder. While we agree with his result, we hold that crimes are not of the same character because they constitute violations of the same statute. Crimes are of the same or similar character if they are "the same type of offenses occurring over a relatively short period of time, and the evidence as to each count overlaps."[9] *United States v. Shearer*, 606 F.2d 819, 820 (8th Cir. 1979).

---

[8] The similarities between the federal and Wisconsin rules governing joinder and severance have been recognized by the supreme court. *Francis v. State*, 86 Wis. 2d 554, 557, 273 N.W.2d 310, 312 (1979). Federal cases therefore provide guidance to our resolution of these state court issues.

[9] The requirement of overlapping evidence does not appear to be imposed by all circuits. *See, e.g., Hill v. United States*, 418 F.2d 449, 450 (D.C. Cir. 1968). For the purpose of this opinion only, we assume without deciding that overlapping evidence is a prerequisite to the finding that two crimes are of the same or similar character for the purpose of joinder.

Davies died about three months after Berge. The instrument of death was unusual and was the same in both cases. The complaint permits the inference that defendant murdered Berge in order to obtain insurance proceeds which would then be used to pay the insurance premiums on Davies' life, as part of a plan to kill Davies for the insurance proceeds on his life. The complaint also allows the inference that defendant killed Davies to prevent him from testifying against her regarding Berge's murder. We conclude that the evidence as to each count overlaps. Since the crimes are also of the same type and occurred over a relatively short period of time, they were not misjoined.

### B. Severance

When a motion for severance is made,

the trial court must determine what, if any, prejudice would result due to a trial on the joined charges. The court must then weigh this potential prejudice against the interests of the public in conducting a trial on the multiple counts. This balancing of competing interests involves an exercise of discretion and a trial court's determination will not be disturbed on appeal in the absence of an abuse of that discretion.

*Bettinger,* 100 Wis. 2d at 696, 303 N.W.2d at 588. We will not find an abuse of discretion unless the defendant can establish that failure to sever the counts caused "substantial prejudice" to her defense. *Werner,* 620 F.2d at 928; *State v. Hall,* 103 Wis. 2d 125, 141, 307 N.W.2d 289, 296 (1981). It is not sufficient to show that some prejudice was caused.

Any joinder of offenses is apt to involve some element of prejudice to the defendant, since a jury is likely to

feel that a [defendant] charged with several crimes must be a bad individual who has done something wrong. However, if the notion of involuntary joinder is to retain any validity, a higher degree of prejudice, or certainty of prejudice, must be shown before relief will be in order. [Footnote omitted.]

Note, *Joinder and Severance Under the New Wisconsin Criminal Procedure Code*, 1971 Wis. L. Rev. 604, 606. *See also United States v. Foutz*, 540 F.2d 733, 736 (4th Cir. 1976) ("If the rationale of the 'other crimes' rule is correct, it would seem that some degree of prejudice is necessarily created by permitting the jury to hear evidence of both crimes.").

The danger of prejudice arising from the jury's exposure to evidence that the defendant committed more than one crime is minimized when the evidence of both counts would be admissible in separate trials. *Bettinger,* 100 Wis. 2d at 697, 303 N.W.2d at 588. "The simple logic behind this rule is that when evidence of one crime is relevant and material to the proof of a second crime, virtually identical evidence will be submitted to the jury whether or not one crime or both crimes are being tried." *Id.* Our inquiry must therefore focus on whether evidence relating to defendant's role in Davies' death would have been admissible in a separate trial for the murder of Berge.[10]

Section 904.04(2), Stats., provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. This subsection

[10] "This standard does not require that every item of evidence relating to one offense be admissible in a separate trial for the other, but rather looks in a broader sense to whether the rules relating to 'other crimes' evidence have been satisfied." *United States v. Foutz*, 540 F.2d 733, 736 n. 3 (4th Cir. 1976).

does not exclude the evidence when offered for other purposes, such as proof of *motive,* opportunity, intent, preparation, *plan,* knowledge, identity, or absence of mistake or accident. [Emphasis supplied.]

As used in sec. 904.04(2), Stats., "plan" means "a design or scheme formed to accomplish some particular purpose." *State v. Spraggin,* 77 Wis. 2d 89, 99, 252 N.W.2d 94, 98 (1977). The state advanced the theory that defendant had Berge make her beneficiary of his insurance policies so that she could kill him, collect the proceeds, and use them to pay the premiums on Davies' $750,000 insurance policy, of which defendant was also the beneficiary. The ultimate goal of this alleged plan, of which the murder of Berge was one step, was to cause the death of Davies and collect $750,000. Inferential support for this theory is found in Berge's decision to make defendant his beneficiary so soon before his death, in Davies' decision to take out an insurance policy when he could not reasonably expect to afford the premiums, in defendant's assumption of ownership of Davies' policy, and in Garrott's testimony that defendant had spoken of a plan to kill a man to collect $750,000 in insurance proceeds.[11]

[11] Defendant argues that the two crimes were not part of a "common scheme or plan" as that term is used in sec. 971.12(1), Stats., in support of the proposition that evidence on the Davies count would have been inadmissible at a trial on the Berge count. Defendant confuses the phrase "common scheme or plan" in that statute with the term "plan" in sec. 904.04(2), Stats. *Compare Francis,* 86 Wis. 2d at 560, 273 N.W.2d at 313, *and Bailey v. State,* 65 Wis. 2d 331, 347, 222 N.W.2d 871, 879 (1974), *with State v. Spraggin,* 77 Wis. 2d 89, 99, 252 N.W.2d 94, 98–99 (1977). We do not rely on the "common scheme or plan" language of sec. 971.12(1) in deciding that the counts were properly joined. The record does contain evidence of a "definite prior design, plan, or scheme which includes the doing of the act charged." *Spraggin,* 77 Wis. 2d at 99, 252 N.W.2d at 98. That evidence is admissible under sec. 904.04(2).

Evidence regarding the Davies count was therefore admissible on the Berge count to show the existence of a plan.

By the same token, evidence as to defendant's role in Davies' death was relevant to establish a motive to kill Berge. *See Haskins v. State,* 97 Wis. 2d 408, 413, 294 N.W.2d 25, 30 (1980). Her motive, according to the state's theory, was to obtain the insurance proceeds on Berge's life to pay the premiums on Davies' policy. The circumstances of Davies' death also permit the inference that she was concerned that Davies would testify against her at trial, and killed him to prevent his incriminating testimony. Defendant could thus be shown to have a guilty mind regarding the death of Berge through her role in the death of Davies. Evidence of other crimes is admissible to show the defendant's state of mind. *State v. Kuta,* 68 Wis. 2d 641, 644, 229 N.W.2d 580, 582 (1975).

Defendant argues that the evidence failed to establish a "plan," or that defendant had a motive or intent to kill Berge, because there was no proof that she: (1) knew she was a beneficiary of the Berge policies; (2) intended to collect the insurance proceeds on Berge's life or to pay the premiums on Davies' insurance; (3) ordered or had access to the chemicals delivered to Davies; or (4) had tried to kill Davies with botulism or could have done so. To the extent that these allegations are true, they have a bearing on the weight the jury would give to the state's theory regarding the alleged plan, motive, or intent, and are proper subjects of argument to the jury. None of defendant's assertions, taken individually or collectively, establish as a matter of law that the alleged plan is too incredible to be believed. The specific arguments now asserted by defendant were not made to the court prior to trial, possibly because it was uncertain at that stage what the state would be able to prove. The trial judge indicated that the danger of prejudice could

be minimized through an appropriate jury instruction, and noted that the evidence on each count would tend to establish motive, intent, or a plan with regard to the other. That the state may have been unable at trial to make a strong showing of a plan, motive or intent does not convince us that the court abused its discretion in deciding prior to trial that the counts should not be severed.

"The danger of prejudice in the trial together of two . . . charges can be overcome by the giving of a proper cautionary instruction." *Peters v. State,* 70 Wis. 2d 22, 31, 233 N.W.2d 420, 425 (1975). The jury was instructed that each count charged a separate crime and must be considered separately, and that defendant's guilt or innocence as found with respect to one crime must not affect the verdict on the other count. This instruction presumptively cured any prejudice which defendant may have suffered from joinder of the two counts.

We conclude that defendant has not demonstrated she was substantially prejudiced by the court's decision not to sever the counts. We therefore find no abuse of discretion in denying defendant's motion to sever.

### IV. *Production of Bank Records*

A representative of Commercial Marine Bank produced records pertaining to defendant's banking transactions at that institution. Defendant contends the state illegally obtained at least some of those records prior to trial. She argues that the state's actions constituted a warrantless seizure of her bank records. She also contends the state's failure to disclose that they would use the records as evidence at trial violated her discovery rights.

## A. Violation of discovery rights

Because defendant did not object on the basis of the state's failure to comply with discovery rules, that objection was waived.[12] Sec. 901.03(1)(a), Stats.; *Turner v. State,* 76 Wis. 2d 1, 16, 250 N.W.2d 706, 714 (1977). Defendant does not claim that the bank records were exculpatory, and the alleged violation of her discovery rights accordingly does not rise to constitutional dimensions. *See Britton v. State,* 44 Wis. 2d 109, 117–18, 170 N.W.2d 785, 789 (1969). We therefore do not reach the merits of the issue.

## B. Warrantless seizure

Defendant objected to introduction of the bank records on the ground that they were seized without a warrant. No ruling was made as to the admissibility of the records at that time. When that question was later discussed, defendant said she had no objection to the receipt of the records into evidence. By failing to continue her objection, and in effect withdrawing it, defendant arguably waived this claim of error. *Estate of Lemke,* 206 Wis. 5,

---

[12] Defendant asserts she objected on the basis of failure to provide her with discovery, citing the following objection: "May I also state for the record that I believe—and I would state for the record—that these subpoenas are unconstitutional, invalid and a denial of the Defendant's rights; that I was informed that this was being done for years as presented at the time she was presented to the John Doe nor did I have an opportunity to cross-examine or move to suppress at the time and therefore it is a violation of her privacy." It stretches the limits of judicial imagination to construe this objection as one based on failure to provide discovery. "[A]n objection to evidence should be made in terms which apprise the court of the exact grounds upon which the objection is based and . . . general objections which do not indicate the ground of inadmissibility will not be sufficient to entitle the objector to raise the question on appeal . . . ." *Holmes v. State,* 76 Wis. 2d 259, 271, 251 N.W.2d 56, 62 (1977).

7, 238 N.W. 806, 806 (1931). *But see Odell v. State,* 90 Wis. 2d 149, 155, 279 N.W.2d 706, 709 (1979) (*per curiam* on reconsideration) (constitutional errors may not be waived by failure to object in a criminal case).

We will review a constitutional error regardless of waiver "if it is in the interest of justice and where there are no factual issues in need of resolution." *State v. Williamson,* 84 Wis. 2d 370, 379, 267 N.W.2d 337, 341 (1978). We therefore review defendant's claim of error.

The bank representative testified that some of the records he produced at trial had been given to a detective about two weeks earlier, while others were produced for the first time at trial. The record indicates that some bank records were produced pursuant to a subpoena at the John Doe hearing regarding Davies' death. The record does not disclose whether the records produced at the John Doe hearing are the same as those given to the police before trial. Defendant referred to police reports at trial which indicated that the police may have obtained some bank records prior to the John Doe hearing. Those police reports were not introduced into evidence and are not before us. There is no indication whether the bank records in the possession of the police prior to the John Doe hearing, if any, were from Commercial Marine Bank. The state indicated that some records were also obtained pursuant to a subpoena at an earlier John Doe hearing into the death of Berge. An investigator testified in an offer of proof that he obtained no records from Commercial Marine Bank.

Whether judicial authorization is required to undertake an inspection of bank records under the Wisconsin Constitution is an unresolved question. *State v. Starke,* 81 Wis. 2d 399, 260 N.W.2d 739 (1978) ; *State v. Gilbertson,* 95 Wis. 2d 102, 288 N.W.2d 877 (Ct. App. 1980). As-

suming without deciding that such a requirement exists, we find no constitutional error.

Our standard of review of a trial court's order at a suppression hearing is stated in *Bies v. State*, 76 Wis. 2d 457, 469, 251 N.W.2d 461, 467 (1977) (citations omitted):

On review of an order suppressing evidence, the findings of fact, if any, of the trial court will be sustained unless against the great weight and clear preponderance of the evidence. However, this court will independently examine the circumstances of the case to determine whether the constitutional requirement of reasonableness is satisfied.

The trial court made no findings of fact. Our review of the evidence satisfies us that there is no evidentiary support for a conclusion that constitutional error occurred. The trial court examined the subpoenas issued pursuant to the John Doe hearing before Judge Bartell. Those subpoenas required production of all defendant's bank records at Commercial Marine Bank. Defendant does not argue that constitutional considerations prohibit the use of a subpoena to produce bank records before a court. Defendant's claim that the police obtained her bank records prior to the John Doe hearing is unsubstantiated by evidence in the record.[13] The only conclusion which may be drawn from the evidence of record is that defendant's bank records were obtained pursuant to subpoena at the John Doe hearing or at trial. Whether or not judicial authorization is required before bank records can be seized, therefore, the failure to suppress the records was not error.

[13] Defendant argues that a police report indicated that the bank records were in the hands of the district attorney prior to the John Doe hearing. The police report is not part of the record on this appeal.

### V. Cross-Examination of Garrott

Defendant asked William Garrott whether he ever took or offered to take a polygraph test. The trial court sustained objections to the questions. Defendant argues that such an offer and its subsequent withdrawal would tend to diminish Garrott's credibility. She also contends that the state's refusal to accept such an offer would indicate that the state was afraid a polygraph test would establish that this key witness was lying. She suggests that the state's doubts about the credibility of its own witness would be probative.

Although a polygraph test result might itself be inadmissible,[14] an offer to take a polygraph examination is relevant to an assessment of the offeror's credibility and may be admissible for that purpose. *Lhost v. State,* 85 Wis. 2d 620, 634 n. 4, 271 N.W.2d 121, 128 (1978). By the same reasoning, a withdrawal of such an offer may also be probative of credibility for the reasons suggested by defendant.

Defendant did not, however, make an offer of proof to establish what Garrott's answers would have been. We therefore cannot determine whether Garrott's testimony would have been beneficial to defendant. When a claim of error is based upon the erroneous exclusion of evidence, "an offer of proof must be made in the trial court as a condition precedent to the review of any alleged

---

[14] At the time of trial, polygraph evidence was admissible only if defendant and defendant's attorney had signed a stipulation as required by *State v. Stanislawski,* 62 Wis. 2d 730, 216 N.W.2d 8 (1974). Polygraph evidence was ruled inadmissible in a criminal proceeding in Wisconsin courts under any conditions in *State v. Dean,* 103 Wis. 2d 228, 307 N.W.2d 628 (1981), unless pursuant to a stipulation executed on or before September 1, 1981. *Dean,* 103 Wis. 2d at 279, 307 N.W.2d at 653.

error." *McClelland v. State,* 84 Wis. 2d 145, 153, 267 N.W.2d 843, 847 (1978). *See* sec. 901.03 (1) (b), Stats. Defendant's failure to meet this condition precludes our review of the alleged error.

## VI. *State's Closing Argument*

*A. Summation of testimony*

Defendant complains that the state misstated the evidence in closing argument. Defendant's mother testified that she and her husband stayed with defendant in her apartment from about noon on March 25 to about 6:00 p.m. on March 26, 1978. She testified that she, her husband, and defendant went to bed at about 10:00 or 11:00 p.m. on March 25. She said that she is a light sleeper, that nothing disturbed her sleep that evening, and that she heard no talking.

During his closing rebuttal argument, the prosecutor referred to defendant's telephone bill which indicated that one ten minute call and two one minute calls were made from defendant's apartment between 12:32 and 1:08 a.m. on March 26, 1978. In reference to those calls and defendant's mother's testimony, the prosecutor said, "They went to bed about ten o'clock that night. All light sleepers. Nothing happened in the night to disturb them. No phone calls. No knocking. That's the unequivocal testimony. Remember that? . . . [N]obody got up. Nobody talked on the phone. Nobody did anything. . . . [N]obody got up and nobody talked and nobody made any noise." Defendant asserts that these statements mischaracterized her mother's testimony.

Defendant failed to object to the state's characterization of her mother's testimony and the error was therefore waived. *State v. Jennaro,* 76 Wis. 2d 499, 512, 251 N.W.2d 800, 806 (1977). Had the claim of error not been

waived, we would nonetheless find no ground for reversal.[15]

The supreme court has stated that closing argument is "the lawyer's opportunity to tell the trier of fact how the lawyer views the evidence" and that the lawyer should not be throttled "by unreasonable restrictions so long as the comments relate to the evidence." *State v. Draize,* 88 Wis. 2d 445, 455–56, 276 N.W.2d 784, 790 (1979).

The judicially established guideposts for a prosecutor's closing arguments are basic. This court has said that counsel in closing argument should be allowed "considerable latitude," with discretion to be given to the trial court in determining the propriety of the argument. The prosecutor may "comment on the evidence, detail the evidence, argue from it to a conclusion and state that the evidence convinces him and should convince the jurors." . . . The line between permissible and impermissible argument is thus drawn where the prosecutor goes beyond reasoning from the evidence to a conclusion of guilt and instead suggests that the jury arrive at a verdict by considering factors other than the evidence.

*Draize,* 88 Wis. 2d at 454, 276 N.W.2d at 789 (citations omitted).

The evidence established that defendant's mother was a light sleeper and that she heard no talking during the night in question. The prosecutor's statement that she

---

[15] Although the prosecutor's comments referred most directly to defendant's mother's testimony, they indirectly impeached the testimony of both her mother and father. Impeachment of her father's testimony is of concern on this appeal because he provided defendant's alibi for the day Berge died. While the telephone bill was used as impeachment only regarding the alibi of March 25 and 26, 1978, the jury received a *falsus in uno* instruction which would have permitted it to disbelieve all of defendant's father's testimony if they disbelieved any part of it. It is therefore conceivable that the jury considered defendant's father's testimony impeached by evidence of the telephone calls in March and accordingly discredited his testimony establishing defendant's alibi on the day of Berge's death.

heard no phone calls is an inference which can be reasonably drawn from the evidence; if she heard no talking in general, she must have heard no talking on the phone. While defendant objects to the statement that her mother's testimony was "unequivocal," her mother did not equivocate on the point that nothing disturbed her sleep and that she heard no talking. Defendant argues that her mother's failure to hear the phone calls does not mean that she was lying about being in the apartment; phone calls could have been made which she did not hear. That argument is simply another view of the evidence. It was the jury's duty to choose between these competing views. The prosecutor did not err in informing the jury which view he preferred.

We also note that the jury was instructed that arguments are not evidence. Such an instruction "places the closing argument in proper perspective." *Draize*, 88 Wis. 2d at 456, 276 N.W.2d at 790. We conclude that the state's closing argument did not overstep the boundaries of the permissible.

### B. Defendant's phone bill

Defendant's telephone bill was initially produced at trial by a telephone company representative in order to show that certain phone numbers were defendant's. Defendant stipulated to that fact and the bill was not then offered into evidence. Defendant later showed the bill to the representative of a pharmaceutical firm and established that the firm's phone number was not on the bill. Defendant moved the admission of the phone bill into evidence at that time and it was received. Defendant attached no limitations to its use as evidence when he moved its admission.

Defendant argues that the purpose of the phone bill was only to establish that certain phone numbers be-

longed to defendant, and that the state was precluded from using it to attack her mother's credibility in closing argument. "Testimony put in on one issue in a lawsuit is not restricted to that issue or to a limited purpose unless at the time of its admission it is so restricted." *Seraphine v. Hardiman,* 44 Wis. 2d 60, 67, 170 N.W.2d 739, 743 (1969). Defendant's failure to limit the use of the phone bill to a particular purpose at the time she moved its admission allowed the state to use it as it wished. We find no error in the state's decision to take advantage of that opportunity.

## C. *Notice of alibi*

Defendant provided the state with a notice of alibi disclosing that her parents were potential alibi witnesses.[16] The state did not notify defendant of rebuttal witnesses it would use to challenge the alibi.

Section 971.23(8), Stats., provides in relevant part:

(a) If the defendant intends to rely upon an alibi as a defense, the defendant shall give notice to the district attorney at the arraignment or at least 15 days before trial stating particularly the place where the defendant claims to have been when the crime is alleged to have been committed together with the names and addresses of witnesses to the alibi, if known. . . .

. . . .

(d) Within 10 days after receipt of the notice of alibi, or such other time as the court orders, the district attorney shall furnish the defendant notice in writing of the names and addresses, if known, of any *witnesses* whom the state proposes to offer in rebuttal to discredit the defendant's alibi. In default of such notice, no rebuttal evidence on the alibi issue shall be received unless

---

[16] The state seems to suggest in its supplemental brief that no notice of alibi was filed. The notice was filed and appears of record.

the court, for cause, orders otherwise. [Emphasis supplied.]

The state argues that it was not required to notify defendant that it would use her phone bill to rebut her alibi. While that is correct, the phone company representative who testified with regard to the bill was an alibi rebuttal witness, and the state was required to provide his name to defendant.

Failure to comply with the requirement of notification of alibi rebuttal witnesses may be cured by granting the defendant a continuance to permit further preparation for trial, or by recessing for a time sufficient to allow the defendant to interview the witness. *Tucker v. State*, 84 Wis. 2d 630, 640, 267 N.W.2d 630, 635–36 (1978). Striking the witness is another method of curing error if a recess or continuance would be inadequate. *Id.*

Defendant failed to request any of these remedies at trial. Because the significance of the phone bill as rebuttal of defendant's alibi did not become apparent until the state's closing rebuttal argument, a recess or continuance would probably have been impracticable.[17] Defendant could, however, have objected to the prosecutor's use of the phone bill for that purpose during argument, and could have requested that whatever reference had been made to the bill prior to her objection be struck and the jury instructed to disregard it. In the absence of any such steps taken to cure the error, we must deem the claim of error to have been waived. *Tucker*, 84 Wis. 2d at 641, 267 N.W.2d at 636.

---

[17] Defendant does not claim error as a result of the state's tactic of waiting until its rebuttal argument to argue this point to the jury. We therefore do not examine that issue.

*D.   Reference to witness' silence*

The prosecutor asked defendant's parents if they went to the police when they first remembered that they were with defendant on the day Berge died. They replied that they did not. During closing argument, the prosecutor attacked the credibility of defendant's alibi by calling attention to the fact that neither parent had informed the police of it when they learned their daughter was charged with a crime. Defendant claims the prosecutor's argument amounted to an improper comment on defendant's silence.

Defendant failed to object to the questioning of her parents or to the prosecutor's closing argument on the ground that they constituted a comment on her silence. *McLemore v. State,* 87 Wis. 2d 739, 753–54, 275 N.W.2d 692, 699 (1979), suggests that failure to object waived her claim of error as a matter of right, but that a comment on silence is sufficiently prejudicial to warrant examination in the interest of justice despite the waiver. Another line of cases, including *Odell v. State,* 90 Wis. 2d 149, 155, 279 N.W.2d 706, 709 (1979) (*per curiam* on reconsideration), and *Holloway v. State,* 32 Wis. 2d 559, 567–68, 146 N.W.2d 441, 445 (1966), holds that direct constitutional error is not waived by a failure to object unless the error is strategic. We find no evidence of a strategic waiver in this case. Whether or not defendant may raise this error as a matter of right, we deem it appropriate for review.

The right to remain silent is personal to the accused. A comment on the failure of an alibi witness to come forward with his or her story ordinarily does not infringe on the defendant's right of silence. *Shadd v. United States,* 423 F. Supp. 511, 514 (W.D. Pa. 1976) ; *McLemore,* 87 Wis. 2d at 758, 275 N.W.2d at 701.

Defendant contends that this case is similar to *United States ex rel. Smith v. Rowe,* 618 F.2d 1204 (7th Cir.)

(*per curiam*), *vacated sub nom. Franzen v. Smith,* 449 U.S. 810 (1980). The court in *Smith* agreed with the general rule that no constitutional violation accrues from impeaching a defense witness by that witness' prior silence. *Smith,* 618 F.2d at 1209 n. 2. In that case, however, the prosecutor's language literally embraced the silence of both the defendant and the witness. *Smith,* 618 F.2d at 1209. The court determined that the prosecutor's comments could be interpreted as referring to the failure of both the defendant and the witness to come forward with the alibi prior to trial. *Smith,* 618 F.2d at 1210. The court held that when the prosecutor's comments are ambiguous as to whether they are directed at the silence of the defendant, they will be deemed impermissible when (1) it was prosecutor's manifest intention to refer to the defendant's silence, or (2) the jury would "naturally and necessarily" take the comment as referring to the defendant's silence. *Id.*

In this case, the prosecutor's questions and comments did not literally embrace the silence of both defendant and her parents and were not capable of being interpreted as referring to defendant's silence. The prosecutor did not, contrary to defendant's suggestion, indicate that the police had no knowledge of defendant's alibi from any source prior to trial. His comments and questions were directed solely to defendant's parents' failure to come forward with that information. We thus conclude that this fact situation does not come within the holding of *Smith.* We therefore hold that the state did not impermissibly comment on defendant's silence.

*By the Court.*——Judgment affirmed.