TUCKER, Plaintiff in error, v. STATE, Defendant in error.

*No. 76–266–CR. Submitted on briefs April 6, 1978.—
Decided June 30, 1978.*
(Also reported in 267 N.W.2d 630.)

For the plaintiff in error the cause was submitted on the brief of *Howard B. Eisenberg,* state public defender, and *Jack E. Schairer,* assistant state public defender.

For the defendant in error the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Pamela Magee-Heilprin,* assistant attorney general.

DAY, J. This matter is before the court on two writs of error. The defendant, plaintiff in error, Ivy T. Tucker complains of error in his judgment of conviction for attempted murder as party to a crime contrary to secs. 939.05, 939.32 (1) and 940.01 (1), Stats. 1975 and armed robbery, party to a crime contrary to secs. 939.05, 943.32 (1) (a) and (2), Stats. 1975. By the second writ of error Mr. Tucker seeks review of the order denying his sec. 974.06 motion for post-conviction relief concerning the same convictions.

There are two issues on this appeal:

1. Was Mr. Tucker denied due process because he was required to disclose his alibi witnesses, although the state failed to disclose the names of witnesses called in the state's case in chief, who contradicted Mr. Tucker's alibi defense?

2. Was Mr. Tucker denied due process because the state failed to give defense counsel copies of a statement that alleged accomplice, Phillip Kidd, gave to the police?

Tucker was charged with attempted first degree murder and attempted armed robbery, party to a crime, contrary to secs. 939.05, 939.32, 940.01 (1) and 943.32 (1) (a), (2), Stats. 1975 by a criminal complaint dated August 30, 1974.[1]

On September 9, 1974 a preliminary hearing was held before Judge Gilbert N. Geraghty in Branch I, Racine County Court. Judge Geraghty found probable cause on

---

[1] Mr. Tucker was a juvenile at the time of the offense charged and these two charges were waived to adult court on August 30, 1974, by Racine County Judge John C. Ahlgrimm.

both counts and bound Tucker over to Branch II, Racine County Court, for further proceedings.

On September 10, 1974 an information was filed charging Tucker with attempted murder, party to a crime, and armed robbery, party to a crime.

On October 29, 1974 a notice of alibi was filed on Tucker's behalf. The notice listed Louise Tucker, the defendant's mother, and Larry Warren, a friend of the Tucker family, as alibi witnesses. In response to the notice the district attorney sent defense counsel a police report with a letter stating that anyone in the report was a possible alibi rebuttal witness. The report listed Chuckie White and Phillip Kidd, but it did not list Virgil Tronset or George Wigman.

On December 10 and 11, 1975 Tucker was tried before a jury. The state's first two witnesses were John Johnson and Henry Rorek. On August 9, 1974 at 11:30 p.m., Mr. Rorek was working behind the bar at his business, Rorek's Club 20, in Racine. Mr. Johnson was his only customer. Two men came into the bar, asked for matches and drew guns. Rorek thought that the men told him to get to the floor and he did. As he went to the floor he picked up his gun, a .22 automatic, and fired. The robbers fired back and Rorek was hit in the head and chest. A third man came in, jumped over the bar and wrestled Rorek's gun away from him. Johnson was shot in the shoulder, but he could not say who shot him.

Rorek was unable to identify any the robbers. Johnson thought that Tucker looked like one of the robbers, but Johnson could not positively identify him.

Phillip Kidd, age seventeen, testified that on August 9, 1974 at about 11:30 p.m., he was near Rorek's Club with Chuckie White and Ivy Tucker. Kidd testified that he and White had first gone inside Rorek's and then come back out. Then White went in again, followed by Kidd and Tucker. Chuckie White pulled a pistol, Tucker had a .38 caliber and Rorek also had a gun. One of them said, ". . . this is a stick up." Kidd jumped over the bar, took

Rorek's gun and was shot. Kidd then jumped back over the bar and ran out. After the robbery Kidd and Tucker went to Tucker's mother's house.

On cross-examination Kidd admitted telling defense counsel previously that he and Tucker had been together from 4:00 until 10:00 p.m. on August 9, 1974. They shot pool at the Traveler's Lounge on Mead Street and then Kidd left Tucker and went to the "tacos place" on Racine Street. According to the previous account given to defense counsel, the next time Kidd saw Tucker was about 11:45 p.m. at Tucker's house. At trial, Kidd denied the part of his earlier story concerning playing pool with Tucker and testified that about 10:00 p.m. he had gone to the tacos place with Tucker and later committed the robbery.

George Wigman worked part-time for private investigator Virgil Tronset and was in Paul's Tap, across the street from Rorek's Club at the time of the robbery. Wigman had just entered Paul's Tap when he heard shots being fired. He then rushed outside and saw a person running across the street, away from the direction of Rorek's Club. This person was twenty-five yards away from Rorek's when Wigman first saw him. After checking the injured in Rorek's, Wigman got into his car, turned into an alley, and saw a person with a gold shirt running across a yard. This was the same person who Wigman had earlier seen running away from Rorek's and who Wigman later saw driving a car with the lights out on Dekoven Street in Racine. At trial, Wigman identified the person as Tucker.

Virgil Tronset, Wigman's employer, was at Paul's Tap with Wigman. Tronset corroborated parts of Wigman's testimony, but was unable to identify Tucker as one of the people running from Rorek's.[2]

---

[2] Timothy Gray, age fourteen, also testified for the prosecution. He claimed he never saw Tucker near Rorek's at the time of the robbery. This contradicted his preliminary hearing testimony which he claimed at trial was perjured.

At the close of the state's case, defense counsel moved for a mistrial on the ground that the names of Wigman and Tronset had not been supplied to the defense as possible alibi rebuttal witnesses. The trial court denied the motion for mistrial.

Tucker testified that he got up around noon on August 9, 1974 and went over to Phillip Kidd's house where he stayed until about 6:00 p.m. Then Tucker and Kidd went to the Traveler's Lounge and played pool until about 10:30 p.m. Tucker then went to his mother's house and watched television and listened to music. Phillip Kidd came to the Tucker residence sometime after 12:00 a.m., with a bloody shirt and fell asleep on the couch. Tucker denied having taken any part in the robbery or shooting at Rorek's.

Tucker's mother, Mrs. Louise Tucker and Larry Warren, a friend of Mrs. Tucker, corroborated Mr. Tucker's account. There was other testimony, some of it contradicted, that Tucker was not in the vicinity of Rorek's Club at the time of the robbery.[3]

On December 12, 1974 the jury returned verdicts finding Tucker guilty of the charges of armed robbery, party to a crime, and attempted murder, party to a crime.

---

[3] Willie McFarland, age sixteen, testified that on August 9, 1974 he was playing with Timmy Gray, Willie Wilson and Irving Walls. McFarland denied seeing Tucker near Rorek's tavern before the shooting, and denied seeing Tucker and Chuckie White enter or leave Rorek's. Irving Walls, age sixteen, testified that he was with Willie McFarland on August 9, 1974 and did not see Tucker in the vicinity of Rorek's bar. Willie Wilson, age fifteen, was with Willie McFarland and Irving Walls on August 9, 1974 and denied seeing anyone going in or out of Rorek's.

As rebuttal witnesses, the state called Detective Gerald Frievalt and juvenile investigator Daniel Peterson, both of the Racine Police Department. Frievalt and Peterson were together when they interviewed Willie McFarland on August 14, 1974. Frievalt testified that McFarland told them that Ivy Tucker and Chuckie White went into the tavern and that he heard shots afterward. Peterson testified that McFarland admitted hearing shots and seeing Tucker go into and come out of Rorek's tavern.

On May 2, 1975 the trial court granted the state's motion for judgment on the verdict and denied Tucker's motions for a mistrial and for a new trial in the interests of justice.

On May 5, 1975 Tucker received a twenty-one year sentence on the attempted murder charge and a concurrent fifteen year sentence for the armed robbery. Both of these sentences were reduced by eight months for preconviction jail time.

Mr. Tucker's sec. 974.06 motion for post-conviction relief was denied on September 29, 1976.

### Alibi Rebuttal.

Mr. Tucker contends that he was denied due process because the state failed to include the names of George Wigman and Virgil Tronset in the list of people who were to be called at trial to rebut Tucker's alibi. Wigman and Tronset testified as part of the state's case in chief and Wigman identified Tucker as one of the people running from the scene of the crime. The state contends that it was not required to provide Wigman's name because he was called in the case in chief.

Sec. 971.23 (8) (d), Stats. 1975 provides that within ten days after the district attorney receives the defendant's notice of alibi,

". . . the district attorney shall furnish the defendant notice in writing of the names and addresses, if known, of any witnesses whom the state proposes to offer in rebuttal to discredit the defendant's alibi. . . ."

In *Williams v. Florida*, 399 U.S. 78, 90 S. Ct. 1893, 26 L. Ed.2d 446 (1970) the U. S. Supreme Court upheld a notice of alibi statute which provided for reciprocal disclosure of prosecution witnesses to the defendant. The court described the function of the statute as follows:

"Florida's notice of alibi rule is in essence a requirement that a defendant submit to a limited form of pretrial discovery by the State whenever he intends to rely at trial on the defense of alibi. In exchange for the defendant's disclosure of the witnesses he proposes to use to establish that defense, the State in turn is required to notify the defendant of any witnesses it proposes to offer in rebuttal to that defense. Both sides are under a continuing duty promptly to disclose the names and addresses of additional witnesses bearing on the alibi as they become available. The threatened sanction for failure to comply is the exclusion at trial of the defendant's alibi evidence—except for his own testimony—or, in the case of the State, the exclusion of the State's evidence offered in rebuttal of the alibi." *Williams* at 399 U.S. 80.

In *Wardius v. Oregon*, 412 U.S. 470, 472, 93 S. Ct. 2208, 37 L. Ed.2d 82 (1973) the court held that the ". . . Due Process Clause of the Fourteenth Amendment forbids enforcement of alibi rules unless reciprocal discovery rights are given to criminal defendants." Under the Oregon statute a defendant was required to give a notice of alibi or lose the right to present an alibi defense. The statute made no provision for reciprocal discovery for the defendant. In striking down the Oregon statute the court reasoned that criminal discovery is a two-way street and that,

"It is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State." *Wardius* at 412 U.S. 476.

The present Wisconsin alibi statute is sec. 971.23(8), Stats.[4] The reciprocity provision of the statute was added by Ch. 196, Laws of 1973. Sec. 971.23(8)(d) was

[4] "971.23, Stats. 1973. **Discovery and inspection.** . . . (8) NO-TICE OF ALIBI. (a) If the defendant intends to rely upon an alibi as a defense, he shall give written notice thereof to the district attorney at the arraignment or at least 20 days before trial stating particularly the place where he claims to have been when

originally 1973 Assembly Bill 1224, requested by the Judicial Council. The Judicial Council's Note to the bill reads as follows:

"The U. S. Supreme Court in Wardius v. Oregon, 93 S. Ct. 2208 (decided June 11, 1973) stated, in striking down the Oregon alibi statute: '. . . the Due Process Clause of the Fourteenth Amendment forbids enforcement of alibi rules unless reciprocal discovery rights are given to criminal defendants.' This proposal adds to the present alibi statute the reciprocity provisions required by Wardius. The proposed statutory addition is [based on] the reciprocity provision of the Florida alibi statute, which received the approval of the U. S. Supreme Court in Williams v. Florida, 399 U.S. 78 (1970)."

In this case the state contends that when sec. 971.23 (8) (d), refers to ". . . any witnesses whom the defendant proposes to offer in rebuttal to discredit the defendant's alibi . . ." the word rebuttal refers only to the rebuttal portion of the trial. Mr. Tucker contends that due process requires that "rebuttal" be interpreted to refer to any prosecution witness who rebuts the alibi, even if called during the case in chief.

In *Williams* at 399 U.S. 80 the court stated that ". . . the State in turn is required to notify the defendant of *any* witnesses it proposes to offer in rebuttal to that

---

the crime is alleged to have been committed together with the names and addresses of witnesses to the alibi, if known. . . ."

"971.23(8), Stats. 1975. **Discovery and inspection.** . . . (d) Within 10 days after receipt of the notice of alibi, or such other time as the court orders, the district attorney shall furnish the defendant notice in writing of the names and addresses, if known, of any witnesses whom the state proposes to offer in rebuttal to discredit the defendant's alibi. In default of such notice, no rebuttal evidence on the alibi issue shall be received unless the court, for cause, orders otherwise."

The 1973 version of sec. 971.23(8)(a) was in force at the time of Tucker's trial and until June of 1976 when the section was amended by L. 1975, C. 378, eff. June 12, 1976 and by L. 1975, C. 421, sec. 486, eff. June 29, 1976.

(alibi) defense." (Emphasis added.) *Wardius* at 412 U.S. 476 referred to criminal discovery as a "two-way street." The Judicial Council's note to sec. 971.23 (8) (d), Stats. referred to the "reciprocity provisions" in the new statute. Discovery under sec. 971.23 (8) (d), Stats., must be reciprocal. When the defendant gives the names and addresses of people who will testify that he was not at the scene of the crime, the state must reciprocate by providing the names of people who will testify that the defendant was at the scene of the crime. This result is required regardless of when during the trial the state's witness is called.[5] Any other interpretation would allow the state to escape the reciprocity requirement of the statute by calling their identification witnesses during their case in chief.

Mr. Wigman's name should have been provided to defense counsel because he identified Tucker as being at the scene of the crime. Mr. Tronset's name did not have to be included in the list of alibi rebuttal witnesses because he did not identify Tucker at the scene of the crime.

It remains to be determined what the proper remedy is for the state's failure to provide Wigman's name to the defense. Sec. 971.23 (8) (d), Stats., provides that the defendant is to be given the names of witnesses and that,

"In default of such notice, no rebuttal evidence of the alibi issue shall be received unless the court, for cause, orders otherwise."

---

[5] This result is explicitly provided for under the Federal Rules of Criminal Procedure. Within ten days after the defendant files his notice of alibi

". . . the attorney for the government shall serve upon the defendant or his attorney a written notice stating the names and addresses of the witnesses upon whom the government intends to rely to establish the defendant's presence at the scene of the alleged offense and any other witnesses to be relied on to rebut testimony of any of the defendant's alibi witnesses." Fed. R. Crim., P. 12.1.

Sec. 971.23(7), Stats., provides in pertinent part that,

". . . The court shall exclude any witness not listed or evidence not presented for inspection or copying required by this section, unless good cause is shown for failure to comply. The court may in appropriate cases grant the opposing party a recess or a continuance."

"We point out when an error is claimed amounting to noncompliance with or abuse of the witness-list requirement, the error or abuse may in some cases be cured by the court granting the other party a continuance so he can adequately prepare for trial, People v. White, 123 Ill. App.2d 102, 259 N.E.2d 357 (1970); Gallegos v. State, 84 Nev. 608, 446 Pac.2d 656 (1968), or by recessing for a period sufficient to allow counsel to interview the witness . . . . People v. Armour, 133 Ill. App.2d 126, 263 N.E.2d 885 (1970); People v. Knox, 94 Ill. App.2d 36, 236 N.E.2d 384 (1968). The granting of a continuance or recess is to be favored over striking the witness. Williams v. State, 264 So.2d 106 (Fla. District Court of Appeal 1972). In order to qualify for a continuance or recess, most courts require the continuance be requested in a timely fashion and that the defendant be surprised and prejudiced by the testimony. People v. White, *supra;* State v. Gaines, 6 Ariz. App. 561, 435 Pac.2d 68 (1967)." *Irby v. State,* 60 Wis.2d 311, 321, 323, 210 N.W.2d 755 (1973).

In *Irby* there was no reversible error where the prosecution called an unlisted witness, but the defense was given an opportunity to interview the witness during the trial and prior to the witness testifying.

At a hearing on motions after verdict on January 6, 1975, the assistant district attorney in this case stated that he did not know that Wigman could identify Mr. Tucker until one-half hour before Wigman testified. The district attorney's ignorance of Wigman's testimony may have been good cause for granting a recess or continuance under sec. 971.23(7), Stats., rather than excluding the testimony.

Granting a continuance so that defense counsel could question Mr. Wigman would have been the favored rem-

edy in this case. That continuance should have been granted unless there was no good cause for providing the name earlier, which does not appear to be the case here. Even if there was no reason for not providing the name, the more drastic and less favored remedy is to exclude the witness' testimony.

Trial counsel in this case bypassed both of these remedies and instead moved for a mistrial at the end of the state's case. By this point the remedies of continuance or striking the witness were no longer possible. Under these circumstances an objection to the testimony of Wigman must be deemed to have been waived. Defense counsel may not procure a mistrial by objecting late to the testimony of witnesses. This is especially true where a timely objection would only have resulted in a continuance or striking of the witness' testimony.

There is no showing that the receipt of Wigman's testimony because of defense counsel's failure to timely object ". . . substantially affected the defendant's right to a fair trial." *McClelland v. State*, ante, p. 145, 267 N.W.2d 843 (1978). See also *Virgil v. State*, ante, p. 166, 267 N.W.2d 852 (1978). We conclude that no "plain error" has been demonstrated in this case.

*Disclosure Of Kidd's Statement.*

Tucker contends that he was denied due process because the state failed to provide defense counsel with a statement that Phillip Kidd gave to the police. The state has a duty to disclose statements that negate the guilt of the defendant, even though the material only affects the credibility of a witness. *Nelson v. State*, 59 Wis.2d 474, 481, 208 N.W.2d 410 (1973); *Loveday v. State*, 74 Wis.2d 503, 516, 247 N.W.2d 116 (1976).

The state argues that it was not required to provide a copy of Mr. Kidd's statement because the district attorney maintained an open file policy and the defense had access to the statement. Access to the file by the defense is not the controlling factor. The prosecution has an affirmative duty in some situations to provide exculpatory material, even if the defense does not request it. *United States v. Agurs*, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed.2d 342 (1976), sec. 971.24(1), Stats. 1975.[6]

The court in *Agurs* made clear that not every failure to disclose will result in a new trial. Prosecution nondisclosure may be an issue in three separate situations. First, the prosecution's case may rest on perjured testimony that the prosecution knew or should have known was perjured. The conviction in such a case must be set aside ". . . if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs* at 427 U.S. 103. Second, the state also has a duty to disclose information for which there has been a specific request. *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed.2d 215 (1963). But, where no request or only a general request for exculpatory information has been made, the failure to disclose is reversible error only where the evidence is so material that it ". . . result[s] in the denial of the defendant's right to a fair trial." *Agurs* at 427 U. S. 108.

"The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt.

---

[6] "971.24. **Statement of witnesses.** (1) At the trial before a witness other than the defendant testifies, written or phonographically recorded statements of the witness, if any, shall be given to the other party in the absence of the jury. For cause, the court may order the production of such statements prior to trial."

It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Agurs* at 427 U.S. 112, 113.[7]

This case falls within the last category of exculpatory material discussed in *Agurs* because no demand for *Brady* material was made. Based on *Agurs,* the disclosure of Kidd's statement would not have created a reasonable doubt where one did not otherwise exist. Kidd's statement is not in the record. What is in the record suggests that the statement would have had little effect. Defense counsel had taken a previous statement from Kidd that supported Tucker's alibi. Kidd admitted giving that statement, but refused to sign it and claimed at trial that the previous statement was false. The best possible facts for the defense would be that Kidd's statement to the police was signed by him and identical to the statement that he gave to defense counsel, but refused to sign. Kidd was cross-examined at trial on the unsigned

---

[7] The court made clear in *Agurs* that this is not the normal harmless error standard. ". . . the judge should not order a new trial every time he is unable to characterize a nondisclosure as harmless under the customary harmless error standard." *Agurs* at 427 U.S. 111, 112.

The *Agurs* standard also differs slightly from the statement in *Loveday* at 74 Wis.2d 517 that, "A new trial is only required where the evidence would in reasonable likelihood have altered the judgment of the jury." To the extent that *Agurs* presents a different rule for evaluating reversible error in cases of prosecution nondisclosure, that rule shall control.

statement, but claimed that it was false. Any additional statement made to the police by Kidd would only be a corroboration of the statement which Kidd admitted making, but the truth of which he denied before the jury.

*By the Court.*—Judgment of conviction and order affirmed.