STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Raul RUIZ, Defendant-Appellant.
[Case No. 82–168–CR.]

STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Antonio SERVANTEZ, Jr., Defendant-Appellant.†
[Case No. 82–1120–CR.]

Supreme Court

*Nos. 82–168–CR, 82–1120–CR. Argued February 1, 1984.—*
*Decided April 24, 1984.*

(Also reported in 347 N.W.2d 352.)

† Motion for reconsideration denied, without costs, June 12, 1984.

178

For the plaintiff-respondent-petitioner the cause was argued by *James H. McDermott*, assistant attorney gen-

eral, with whom on the briefs was *Bronson C. La Follette,* attorney general.

For the defendant-appellant in #82–168–CR, there was a brief by *Martin I. Hanson* and *Hanson & Gasiorkiewicz,* Racine, and oral argument by *Martin I. Hanson.*

For the defendant-appellant in #82–1120–CR, there was a brief and oral argument by *Louis B. Butler, Jr.,* assistant state public defender.

DAY, J.   This is a review of two consolidated criminal cases. The two defendants were each convicted in the circuit court for Kenosha county, Hon. Michael S. Fisher, Circuit Judge, of party to the crime of first-degree murder under secs. 940.01 and 939.05, Stats. 1979–80.[1] The court of appeals reversed both convic-

---

[1] "940.01.   **First-degree murder.** (1) Whoever causes the death of another human being with intent to kill that person or another is guilty of a Class A felony.

"(2) In this chapter 'intent to kill' means the mental purpose to take the life of another human being."

"939.05.   **Parties to crime.** (1) Whoever is concerned in the commission of a crime is a principal and may be charged with and convicted of the commission of the crime although he did not directly commit it and although the person who directly committed it has not been convicted or has been convicted of some other degree of the crime or of some other crime based on the same act.

"(2) A person is concerned in the commission of the crime if he:

"(a) Directly commits the crime; or

"(b) Intentionally aids and abets the commission of it; or

"(c) Is a party to a conspiracy with another to commit it or advises, hires, counsels or otherwise procures another to commit it. Such a party is also concerned in the commission of any other crime which is committed in pursuance of the intended crime and which under the circumstances is a natural and probable consequence of the intended crime. This paragraph does not apply to a person who voluntarily changes his mind and no longer desires that the crime be committed and notifies the other parties concerned of his withdrawal within a reasonable time before the

tions in a consolidated appeal.[2] The issues on this review are: Is the defendant Ruiz entitled to a new trial due to the prosecutor's failure to provide the defendant with certain allegedly exculpatory evidence? Is the defendant Servantez entitled to a new trial due to the prosecutor's failure to provide the defendant with prior oral statements of the defendant under sec. 971.23(1), Stats.[3] or in the interest of justice? We conclude that the answer to both questions is "no." We therefore reverse the decision of the court of appeals and reinstate the judgments of the trial court.

At about 12:45 a.m. on May 11, 1980, the body of seventeen year old Richard Woten was discovered in an alley behind a tavern known as Zimmerman's bar in Kenosha, Wisconsin. The victim had been beaten about the head and stabbed four times in the chest and back. One of the stab wounds penetrated Woten's pericardial sac causing his death.

On March 30, 1981, a criminal complaint was issued naming Raul Ruiz and Antonio Servantez as parties to the crime of the first-degree murder of Richard Woten. In a preliminary hearing commenced on April 22, 1981, in the Kenosha County Circuit Court, Judge John E.

commission of the crime so as to allow the others also to withdraw."

[2] *State v. Ruiz,* 113 Wis. 2d 273, 335 N.W.2d 892 (1983).

[3] "971.23(1). Discovery and inspection. DEFENDANT'S STATEMENTS. Upon demand, the district attorney shall permit the defendant within a reasonable time before trial to inspect and copy or photograph any written or recorded statement concerning the alleged crime made by the defendant which is within the possession, custody or control of the state including the testimony of the defendant in an s. 968.26 proceeding or before a grand jury. Upon demand, the district attorney shall furnish the defendant with a written summary of all oral statements of the defendant which he plans to use in the course of the trial. The names of witnesses to the written and oral statements which the state plans to use in the course of the trial shall also be furnished."

Malloy found probable cause to believe a felony had been committed by the defendants and bound both defendants over for trial. By information dated May 11, 1981, each of the two defendants was charged with being a party to the crime of first-degree murder.

The two defendants were tried separately. Ruiz' trial commenced on October 12, 1981, and concluded on October 16, 1981. Servantez' trial commenced on October 26, 1981, and concluded on October 30, 1981. Both defendants were found guilty of being parties to the crime of first-degree murder and both were sentenced to life imprisonment. The evidence adduced by the state at the two trials revealed the following sequence of events on the night of Mr. Woten's death.

At approximately 10:00 p.m. on May 10, Raul Ruiz, Antonio Servantez and John Reyes arrived at the residence of Castula Ostrowski who lived across the street from Zimmerman's bar. The three men had come to spend the evening with Ms. Ostrowski and Gloria Delgado, Ruiz' girl friend, who lived in the same house.

Shortly after arriving, Ruiz crossed the street to Zimmerman's bar to play pool. He became involved in an argument with the other patrons over the use of the game tables and Joseph Zimmerman, the tavern owner's son, asked him to leave. When Ruiz refused, the police were summoned and Ruiz was escorted out.

Ruiz returned to Ostrowski's house and, according to Ostrowski, told Servantez: "[T]hem honkies messed over me, we going to let them get away with it? Let's go over there." A few minutes later, Ruiz, Servantez and Reyes left together for Zimmerman's. Servantez and Reyes went into the tavern and purchased some beer while Ruiz waited outside. Servantez and Reyes came back outside and stood outside the door with Ruiz. When Michael Haubrich, one of the tavern patrons, exited through the door, Ruiz called him a "fucking

honky" and hit him on the side of the face. Other tavern patrons rushed out the door into the street and Ruiz, Servantez and Reyes ran away. The police were again called. They investigated the situation and talked to Ruiz outside the Ostrowski home. He stated that he had not been back to the bar. The officers left around midnight after advising Zimmerman to close the tavern early to prevent further trouble.

As the bartender was closing, Woten, who had been to the tavern earlier that evening to cash a check, entered looking for his friend Joseph Zimmerman. The bartender informed him Zimmerman had left.

At about 12:15 a.m., Helen Bartholomew, a neighbor who occupied a second story apartment overlooking the parking lot adjacent to Zimmerman's, saw two figures run through the parking lot. A few minutes later she heard shuffling feet, shouts and a thud that sounded as if something had hit the garage located adjacent to the alley below her house. She walked out of the house onto a porch and saw two men in the alley below. One of the two, the taller more slender man, was standing while the shorter more stocky individual was bending over an object on the ground. When Bartholomew called her son's name, the taller man said: "[L]ets get out of here; they're after us already." He then moved quickly away. Bartholomew called out again. The shorter man, who was still bent over the object on the ground, looked up and said that it was Frank, his friend, who was sick. Bartholomew's description of the shorter man matched the body build of Ruiz and her description of the taller man that of Servantez. The police were called and arrived on the scene at about 12:45 a.m. They discovered Woten's body in the alley. The victim's watch and approximately twenty-five dollars in cash were still on his person. Bruises on his forehead showed he had been hit by a

blunt object more than once. There were four stab wounds in his back and chest. Dirt ingrained in the knees of his trousers and the palms and knuckles of his hands indicated a struggle.

Ostrowski testified that shortly after midnight, Ruiz and Servantez returned to her house out of breath as if they had been running. She noticed that there was freshly cut grass on Servantez' hand and his shirt was open. It had not been open earlier in the evening. Loose buttons were found near Woten's body.

Ostrowski testified that she heard Ruiz telling Gloria Delgado that he and Servantez had beaten someone up, that they had kicked him and he had said, "why me, why me?" and he, Ruiz, kicked him again. Servantez also reportedly said that they had beaten someone up and that the person had thrown up on him. He then went into the bathroom to take a shower.

At the Servantez trial, the state also called Gloria Delgado. She denied hearing the statements attributed to the defendants. However, she told police in a statement made several days after the murder that she heard Servantez say, "[W]e got one of the mother fuckers." Ruiz responded that "[W]e got the wrong one," whereupon Servantez said, "[T]he mother fuckers are all alike. We should have used a gun." Delgado's statement was admitted into evidence at Servantez' trial.

Several minutes after Servantez and Ruiz entered the house, Ostrowski heard sirens outside. Ruiz told the others to close the curtains and turn off the lights and music.

At about 5:00 a.m., the police entered Ostrowski's house with her permission. Ruiz was awakened and taken into custody for questioning. Servantez had left the house, apparently through the bathroom window, sometime during the early morning hours leaving his shoes behind.

During the questioning of Ruiz, his pants were seized to analyze a stain on one of the knees. A laboratory analysis by a forensic pathologist determined that the stain was blood. The pathologist also determined that the blood on the trousers was of the same international blood group type as the blood of the victim but different from the blood type of either of the defendants. Further tests showed that the enzyme types of the blood taken from the trousers were consistent in all respects for which a reliable test could be made with the enzyme types of Woten's blood. The pathologist estimated that blood with the particular characteristics he had identified would be expected to occur in approximately two percent of the white male population.

The police never found a murder weapon. When asked by police to check, Ostrowski determined that a knife she had been using earlier in the evening to peel potatoes was missing from her house.

Both defendants testified on their own behalf. Each pointed an accusing finger at the other and claimed innocence for himself. Ruiz testified that he left the house with Servantez to retrieve something from the car. He entered the front seat of the car to trip the trunk release mechanism and Servantez went behind the car. When Ruiz got out of the car, he saw Servantez struggling with someone. Ruiz tried to pull Servantez away from the other person and was himself thrown onto the ground. He pursued Servantez and found Woten in the alley already dead. He was leaning over the body when the exchange with Helen Bartholomew occurred.

Servantez' testimony inculpated Ruiz. He stated that it was he who was in the front seat and Ruiz was behind the car. When he got out of the car, he saw Ruiz near the entrance to Zimmerman's. Ruiz went around the corner behind the tavern and was temporarily out of view. Servantez followed and discovered

Ruiz fighting with someone at the end of the alley. Helen Bartholomew called out and Servantez walked away. He threw up and then went back to Ostrowski's house.

The focus of the argument of both defendants in this court and in the court of appeals is an item of evidence not mentioned above. During the examination of Castula Ostrowski in the Servantez trial, District Attorney Robert Zapf inquired into a conversation she had heard between Servantez and another man, Joe Sanchez, while the three of them were in an automobile in Racine on May 12, 1980. Zapf elicited the following testimony:

"Q. After Tony Servantez got in the car, was there any conversation?
"A. Yes.
"Q. What was said?
"A. Joe asked him if he got rid of the knife. Tony said yes. And he also said that he was—Tony said he was going to run himself in the following day."

This testimony came midway through the Servantez trial and after the Ruiz trial was already completed. The prosecutor was first made aware of Servantez' statement by Ostrowski sometime during the Ruiz trial. Neither defense counsel had been informed of the evidence prior to the time it was elicited by the district attorney at Servantez' trial. Both defendants assert that they were entitled to be informed of the existence of the evidence prior to the time it was revealed at trial.

The court of appeals agreed with both defendants that they were entitled to be informed of the existence of the evidence. The court declined to reach the question of whether the failure to turn over the evidence was prejudicial to the defendants. It reversed both convictions rather as a disciplinary action based on what it perceived as a "continuing pattern of non-disclosure" of evidence by the Kenosha county district attorney's office. The court stated:

"We expressly refuse to decide whether the standard [harmless error] tests . . . are satisfied . . . because we think that the situation in Kenosha county has reached a point where our decision must be prospective looking as well as remedial. The issue is no longer only how certain we can be that the jurors would not have changed their minds about the guilt of an individual defendant, but how the Kenosha prosecutors can be persuaded to respect the valued institutional objective of conducting orderly trials." 113 Wis. 2d at 286.

Inasmuch as the two cases present different claims for entitlement to the non-disclosed evidence and are therefore governed by different legal standards, we will consider each case separately.

## *STATE v. RUIZ*

The basis for Ruiz' claim to entitlement to the statement by Servantez regarding the disposal of the knife is the United States Supreme Court's decision in *Brady v. Maryland,* 373 U.S. 83 (1963). In that case Brady and a companion named Boblit had been convicted of first-degree murder and sentenced to death in separate trials. Brady was tried first. At trial he took the stand and admitted participation in the crime but claimed that Boblit did the actual killing. Prior to trial, counsel for Brady had requested the prosecution to permit him to examine all of Boblit's extra judicial statements. The prosecutor turned over several of those statements but withheld one in which Boblit admitted the actual homicide. In a petition for postconviction relief, Brady claimed that the prosecution's failure to turn over the requested statement denied him due process of law. The Supreme Court agreed stating, "[W]e now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to pun-

ishment, irrespective of the good faith or bad faith of the prosecution." 383 U.S. at 87.

The scope of a prosecutor's duty to inform a defendant of evidence in his possession favorable to the defendant was clarified in the United States Supreme Court case of *United States v. Agurs,* 427 U.S. 97 (1967). The defendant in *Agurs* had been convicted of second-degree murder. The victim had been stabbed to death shortly after he and the defendant had checked into a motel room. The defendant presented no evidence at trial. Her sole defense was argument by her counsel that she acted in self defense. There had been no request prior to trial for exculpatory evidence.

Three months after the trial was over with, the defense filed a motion for a new trial. The defense based its claimed entitlement to a new trial on the grounds that the prosecution had failed to turn over evidence of the victim's prior criminal record. It claimed that the victim's prior convictions for assault and carrying a deadly weapon gave evidence of his violent character and were supportive of its claim that the defendant acted in self defense.

In deciding whether the prosecution had a duty to turn over the allegedly exculpatory evidence, the Court described three different situations of prosecutorial non-disclosure and found a different standard for each. The first situation is where the undisclosed evidence shows that the prosecutor's case included perjured testimony and the prosecutor knew or should have known that fact. Such a conviction obtained through perjured testimony is "fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." 427 U.S. at 103. (Footnotes omitted.)

The second situation, exemplified by *Brady v. Maryland,* is where the defense makes a pretrial request for

specific evidence which would tend to exculpate the defendant or reduce the penalty. In those circumstances, the Court said:

"[I]t is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." 427 U.S. at 106.

The third situation is where the defense either makes no request or makes a general request for "exculpatory evidence" or "*Brady* evidence." In the general or no request situation, which the court said are to be treated the same, the defendant has been denied due process only if the undisclosed evidence creates a reasonable doubt that did not otherwise exist. The Court stated:

"The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." 427 U.S. at 112–113. (Footnotes omitted.)

The higher standard of materiality giving rise to a duty of disclosure in situations where there has been no request or only a general request is explained by the fact that in those situations notice of the prosecutor's duty to disclose must come from the obviously exculpatory character of the evidence. If a prosecutor were required

to disclose everything that might affect the jury's verdict, (the typical constitutional harmless error standard), "[t]he only way a prosecutor could discharge his constitutional duty would be to allow complete discovery of his files as a matter of routine practice." 427 U.S. at 109. The rule as announced maximizes the protections for defendants while at the same time avoiding impossible burdens on prosecutors and preserving the finality of convictions fairly obtained.

The Court was careful to point out that the same standard which governs the determination of whether non-disclosure deprived a defendant of a fair trial also governs the determination of whether the prosecution has a duty to volunteer exculpatory evidence. "[U]nless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose." 427 U.S. at 108.

The Court in *Agurs* also recognized the uncertainty inherent in attempting to assess the significance of an item of evidence relative to the completed record *prior* to trial. The Court stated that this standard which determines materiality in relation to the entire record should incline the prudent prosecutor to "resolve doubtful questions in favor of disclosure" (427 U.S. at 108) rather than risk reversal when the entire record is complete and the significance of the evidence can be properly evaluated. However, the Court returned to the "critical point [that] the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." 427 U.S. at 108. The Court concluded that the prosecutor's failure to tender the victim's record to the defense did

not deprive the defendant of a fair trial under the due process clause.

This court has applied the rule of *United States v. Agurs,* on several occasions. (*Ruiz v. State,* 75 Wis. 2d 230, 249 N.W.2d 277 (1977) nondisclosure of information that prosecution would seek recommendation that witness for state not be incarcerated on a separate burglary charge did not raise reasonable doubt that did not otherwise exist; *Tucker v. State,* 84 Wis. 2d 630, 267 N.W.2d 630 (1978) disclosure of witness' statement would not have created a reasonable doubt that did not otherwise exist; *Roe v. State,* 95 Wis. 2d 226, 247, 290 N.W.2d 291 (1980) "opinions of . . . psychiatrists regarding the appropriate degree of criminal responsibility with which to charge the defendant were not of a magnitude to create a reasonable doubt which did not otherwise exist;" *State v. Humphrey,* 107 Wis. 2d 107, 318 N.W.2d 386 (1982) no duty to turn over breathalyzer test ampoule absent a specific request).

In the present case we are not dealing with a situation of prosecutorial misconduct through use of perjured testimony. The defendant has not demonstrated any conflict between the evidence adduced by the state at trial and the undisclosed evidence.

Likewise, this is not a case of the prosecutor's failure to respond to a request for specific evidence. The defendant's original counsel, Mr. Alan Eisenberg, sent two letters requesting exculpatory evidence. One dated April 27, 1981, was addressed to the office of the district attorney. The second, dated June 12, 1981, was addressed to "Mr. John Paul Landa, District Attorney, Kenosha County." The body of the two letters was identical. Both stated: "We, further, request that you furnish us with any and all exculpatory evidence that you have

in your possession including evidence which bears on the credibility of any state witness." In a motion and notice of motion to compel discovery, the defendant requested, i.a., "Any and all other records and/or information which arguably could be helpful or useful to the defense in impeaching or otherwise detracting from the probative force of the plaintiff's evidence or which arguably could lead to such records or information." Neither of these statements is a specific request triggering a duty on behalf of the prosecutor to turn over specific evidence. If there was a duty to turn over evidence of Servantez' statement regarding disposal of the knife, it must arise from the obviously exculpatory character of the evidence and exists irrespective of whether a request was made by the defense. Under *Agurs* and our own cases following *Agurs*, the standard by which we determine the existence or not of a duty voluntarily to disclose the evidence is whether, viewing the record as a whole, the undisclosed evidence raises a reasonable doubt that did not otherwise exist.

There are two uses to which Servantez's statement may have been put in the hands of Ruiz' attorney: (1) it could have been used to impeach Ostrowski's credibility; and (2) it could have been used as evidence that Servantez acted alone.

During Ostrowski's testimony at the preliminary hearing she was questioned by District Attorney Zapf concerning the meeting between herself, Antonio Servantez and Joe Sanchez in the automobile in Racine. At that time she was specifically asked if she heard any conversation between Servantez and Sanchez. She answered the question "no." Had Ostrowski been asked at Ruiz' trial concerning the meeting, as she was at Servantez' trial, she presumably would have recounted Sanchez' question about the knife and Servantez' answer. The inconsistency between these two statements could have

been used by Ruiz' counsel to make a general attack on Ostrowski's credibility.

Although the statement may have had some impeachment value to the defense, it strains credulity to believe that it was sufficient to raise a reasonable doubt as to Ruiz' guilt that did not otherwise exist. During cross-examination of Ostrowski at trial, counsel for the defendant pointed to a number of instances where Ostrowski's trial testimony was inconsistent with her testimony at the preliminary hearing. It is unlikely that one additional example of inconsistency would completely alter the jury's view of the witness.

Counsel for Ruiz might also have attempted to use Servantez' statement to support his general claim that Servantez acted alone in killing Woten and that Ruiz came upon the scene after the victim was already dead. Servantez' statement about the knife, though consistent with Ruiz' version of the events on the night of the murder, is not sufficient to raise a reasonable doubt as to his guilt. Sanchez asked, according to Ostrowski's testimony, if Servantez had gotten rid of the knife. Servantez said he had. This statement is inconclusive as to who stabbed Woten. Even if it was Servantez who threw the knife away, it does not follow that it was Servantez who used it. Moreover, even if it was Servantez who did the actual stabbing, that does not exculpate Ruiz. Ruiz was convicted as a party to the crime of murder. The court correctly instructed the jury that:

"A person intentionally aids and abets the commission of a crime when he undertakes conduct, either verbal or overt action, which as a matter of objective fact aids another person in the execution of a crime, and further he consciously desires or intends that his conduct will

yield such assistance or that he is ready and willing to render aid, if needed, and the person who commits the crime knows of the willingness to aid him.

"However, a person does not aid and abet if he is only a bystander or spectator innocent of any unlawful intent and does nothing to assist or encourage the commission of a crime.

"If a person intentionally aids and abets the commission of a crime, then that person is guilty of the crime as well as the person who directly committed it."

This court was faced with a situation similar to the present case in *State v. Sharlow,* 110 Wis. 2d 226, 327 N.W.2d 692 (1983). There the question was whether the hearsay statement of a codefendant was sufficiently critical to the defendant's case so that it could not constitutionally be excluded as hearsay. The court stated:

"Sharlow asserts that the hearsay testimony of both Henne and McNeal was sufficiently critical and reliable to be admitted at his trial. In *State v. Brown,* we noted that the proffered testimony was critical to the defendant's case, since if the testimony and the declarants' hearsay statements were believed, the defendant would have been exculpated. 96 Wis. 2d at 246–47. This is not true of Blanchette's hearsay statements to Henne. The fact that Blanchette may have told Henne that he had shot Frahm would not have exculpated Sharlow, since Sharlow was charged with being a party to the crime of murder. Under these circumstances, the statements are not so critical to Sharlow's defense that their exclusion denied him a fair trial." 110 Wis. 2d at 234–235. (Footnotes omitted.)

Likewise in this case Ruiz need not have wielded the knife or even landed a blow to be guilty of the offense charged.

Finally, we note that the Court in *Agurs* particularly stressed the importance of the trial court's evaluation of the newly discovered evidence. 427 U.S. at 113–114.

The circuit court judge who presided at Ruiz' trial stated as to the undisclosed evidence that the evidence against Ruiz was "sufficiently strong that such a statement, if it had any effect, would not have sufficient effect to change the verdict. . . ." We agree.

We conclude that viewed in the light of the entire record, the statement concerning Servantez' disposal of the knife was not sufficient to raise a reasonable doubt that did not otherwise exist. Therefore, there was no violation of the prosecutor's duty to turn over the evidence and no violation of Ruiz' right to a fair trial.

The court of appeals reversed Ruiz' conviction on the grounds that the prosecutor violated his constitutional duty to disclose exculpatory evidence. The court arrived at this disposition without ever assessing the likely impact of the undisclosed evidence on the trial. It should be evident from what has been said above that the situation the court of appeals posed for itself, i.e., a violation of the prosecutor's constitutional duty of disclosure that does not result in a violation of the defendant's due process right to a fair trial, logically cannot arise. A determination that the prosecutor breached a duty to disclose exculpatory evidence necessarily involves a determination that the defendant has been denied constitutional due process. Each time the prosecutor violates his duty of disclosure under the Constitution, he will be "punished" by having the illegally obtained conviction or sentence overturned. Since there was no duty and no deprivation of due process in this case, the decision of the court of appeals must be reversed and the judgment of the trial court reinstated.

## STATE v. SERVANTEZ

The defendant Servantez' right to be informed of his statement regarding disposal of the knife derives not from the due process clause of the Constitution but from a state evidentiary statute.[4] Section 971.23(1), Stats. provides:

"**971.23. Discovery and inspection.** (1) DEFENDANT'S STATEMENTS. Upon demand, the district attorney shall permit the defendant within a reasonable time before trial to inspect and copy or photograph any written or recorded statement concerning the alleged crime made by the defendant which is within the possession, custody or control of the state including the testimony of the defendant in an s. 968.26 proceeding or before a grand jury. Upon demand, the district attorney shall furnish the defendant with a written summary of all oral statements of the defendant which he plans to use in the course of the trial. The names of witnesses to the written and oral statements which the state plans to use in the course of the trial shall also be furnished."

Servantez' oral statement to Joe Sanchez falls within the scope of the statute. *Kutchera v. State,* 69 Wis. 2d 534, 543–545, 230 N.W.2d 750 (1975). It is undisputed that Servantez' attorney requested disclosure of the defendant's statements which the prosecutor planned to use at trial. Section 971.23(7) imposes a continuing duty to disclose after the request is made. District Attorney Zapf has not demonstrated "good cause" for his failure to comply with the disclosure requirement under sec.

[4] In *State v. Humphrey,* 107 Wis. 2d 107, 318 N.W.2d 386 (1982), this Court said, quoting *Weatherford v. Bursey,* 429 U.S. 545, 559 (1977):

"There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one; as the Court wrote recently, 'the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded. . . .' *Wardius v. Oregon,* 412 U.S. 470, 474 (1973)." 107 Wis. 2d at 116 n. 4.

971.23(7). We conclude that Zapf was required by law to disclose the statement to the defendant and that his use of the statement at trial without having informed counsel for the defendant was error.

The remedy for failure to comply with a duty of disclosure is stated in sec. 971.23(7), Stats. That section states:

"**971.23. Discovery and inspection. . . .** (7) CONTIN-UING DUTY TO DISCLOSE, FAILURE TO COMPLY. If, subsequent to compliance with a requirement of this section, and prior to or during trial, a party discovers additional material or the names of additional witnesses requested which are subject to discovery, inspection or production hereunder, he shall promptly notify the other party of the existence of the additional material or names. The court shall exclude any witness not listed or evidence not presented for inspection or copying required by this section, unless good cause is shown for failure to comply. The court may in appropriate cases grant the opposing party a recess or a continuance."

The state argues that any error caused by the district attorney's failure to disclose Servantez' statement regarding disposal of the knife was cured by continuances granted by the trial court. Shortly after Ostrowski testified concerning the conversation between Servantez and Sanchez, counsel for the defendant made a motion for a mistrial on the grounds the prosecution had failed to comply with criminal discovery requirements. This motion was denied. Counsel for the defendant then moved the court for a continuance to permit him to prepare for cross-examination of Ostrowski. This occurred at approximately 3:00 p.m. The trial court granted a continuance until 8:30 a.m. the next morning and ordered that Joe Sanchez, who was under subpoena by the state, be made available for questioning by defense counsel.

The next morning counsel for the defendant renewed his motion for a mistrial. After hearing evidence on

the matter, the trial court denied the mistrial motion but granted a further continuance until 1:00 p.m. that day. Defense counsel stated that he would need more time. The proceedings were reconvened at 1:30 p.m. that day.

This court has stated that "when an error is claimed amounting to noncompliance with or abuse of the witness-list requirement [under sec. 971.23(1)], the error or abuse may in some cases be cured by the court granting the other party a continuance so he can adequately prepare for trial." *Tucker v. State*, 84 Wis. 2d 630, 640, 267 N.W.2d 630 (1978); (quoting *Irby v. State*, 60 Wis. 2d 311, 321, 210 N.W.2d 755 (1973)). We are not aware of any Wisconsin case holding that failure to comply with a request to disclose statements made by the defendant can be cured by granting a continuance. We need not reach that question in this case, however, because we conclude that the error was harmless.

As stated above, this case involves the breach of a statutory rather than a constitutional duty. The standard for determining whether a nonconstitutional error is harmless was stated in *State v. Gavigan*, 111 Wis. 2d. 150, 330 N.W.2d 571 (1983).

"The test of harmless error is not whether some harm has resulted, but, rather, whether the appellate court in its independent determination can conclude there is sufficient evidence, other than and uninfluenced by the inadmissible evidence, which would convict the defendant beyond a reasonable doubt. This test is based on reasonable probabilities." 111 Wis. 2d at 163 (quoting *Wold v. State*, 57 Wis. 2d 344, 356, 204 N.W.2d 482 (1973)).

This standard of appellate review is consistent with the rule of sec. 971.23(7), Stats., requiring exclusion from trial of evidence not presented to defense counsel for

inspection. In this case there was no opportunity for the trial judge to exclude the evidence because he was not aware of its existence until it had been elicited by District Attorney Zapf. It follows that the conviction should be overturned only if it appears that the result might probably have been more favorable to the defendant had the evidence been excluded. *Gavigan*, 111 Wis. 2d at 163.

This court faced a situation similar to the present case in *Kutchera v. State*. The defendant in that case was tried in two trials for seven separate burglaries. The state's case included testimony by two witnesses of statements made by the defendant connecting him to the crime. One of the witnesses testified that the defendant told her "he cut his arm breaking into the golf course bar and that 'they' had gone to the Eagles Club and Trails End Tavern on the same night." 69 Wis. 2d at 538. Another witness testified the defendant told him that "they were going to hit the golf course clubhouse." 69 Wis. 2d at 539. There was also a considerable amount of other testimony inculpating the defendant including testimony by the defendant's companion that he and the defendant had entered the burglarized premises and taken money and cigarettes.

The prosecution failed to provide written summaries of these statements although a request had been made under sec. 971.23(1), Stats. On appeal, the defendant claimed that the failure to disclose the statements was error. The court agreed that the prosecution erred but held that the error did not require reversal. The court stated: "[T]here is no basis for reversal of the judgment of conviction herein since the testimony about the defendant's oral statements did not affect the substantial rights of the defendant. Even without the testimony in question, there remains ample evidence of the defendant's guilt." 69 Wis. 2d at 545.

We reach a similar conclusion as to the undisclosed evidence in this case. Ostrowski's testimony that Servantez said that he had disposed of the knife merely added one detail to an already strong case. Our reading of the record persuades us that the exclusion of Servantez' statement would not have affected the result.

The defendant Servantez also claims that he is entitled to a new trial in the interest of justice under sec. 751.06, Stats. That section states:

"**751.06. Discretionary reversal.** In an appeal in the supreme court, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record, and may direct the entry of the proper judgment or remit the case to the trial court for the entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice."

The rule for granting a new trial under sec. 751.06, Stats., is that "a new trial in the interest of justice will be granted only if there has been an apparent miscarriage of justice and it appears that a retrial under optimum circumstances will produce a different result." *State v. Cuyler*, 110 Wis. 2d 133, 142, 327 N.W.2d 662 (1982) (quoting *Garcia v. State*, 73 Wis. 2d 651, 655, 245 N.W.2d 654 (1976)). The defendant's claim for discretionary reversal presents the same question as his claim for reversal based on the prosecution's failure to divulge the defendant's oral statement prior to trial. Having resolved that question against the defendant, we need not discuss it further.

There remains the question of whether the conviction should be reversed as a disciplinary measure directed at District Attorney Zapf. In this case, unlike the *Ruiz* case, there was a breach of the prosecutor's duty of disclosure. Therefore the reasoning of the court of appeals in reversing the trial court requires fuller treatment.

As the court of appeals noted, this court anticipated that there may come a time when it is necessary to reverse a conviction as a means of guaranteeing the integrity of the judicial process even though there has been no showing of prejudice to the defendant. In *Nelson v. State,* 59 Wis. 2d 474, 487, 208 N.W.2d 410 (1973), this court said:

"While the state committed constitutional error in the suppression of exculpatory evidence, such error did not constitute prejudicial error or require a new trial in the interest of justice. This is not a case wherein the serious misconduct of the prosecutor necessitates a new trial, even in the absence of a showing of prejudice, in order to sustain the integrity of the judicial process. A conviction obtained by means of a fair trial will not be overturned and a new trial granted to punish society for the nonprejudicial misconduct of the prosecutor." (Citation omitted.)

Before reaching its decision to reverse, the court of appeals carefully considered each of District Attorney Zapf's asserted reasons for failing to turn over the evidence and found all of them wanting. It concluded that "the nondisclosure was a result of, if not a deliberate act of suppression, a complete and total disregard of duty and indifference to present legal obligations on the part of the Kenosha prosecutor's office." 113 Wis. 2d at 279.

The court of appeals also noted that the present case is not the first time allegations of misconduct have been made against the Kenosha county district attorney's

office. It referred to a number of its own cases and quoted this court's opinion in *State v. Copening,* 101 Wis. 2d 700, 303 N.W.2d 821 (1981), wherein this court characterized District Attorney Zapf's failure to disclose evidence as "inexcusable" (101 Wis. 2d at 716) and "an insult to the institutional values of an orderly trial." (101 Wis. 2d at 719). Faced with what it perceived as a continuing pattern of nondisclosure and an apparent obstinacy in the face of lesser measures, the court of appeals concluded that it must take the extreme step of reversing the conviction in order to impress upon District Attorney Zapf the necessity of abiding by the law.

Reversal of convictions as a means of preserving the integrity of the judicial process and deterring illegality on the part of prosecutors should be approached with caution. *United States v. Hasting,* —— U.S. ——, ——, 103 S. Ct. 1974, 1979 (1983). A court should take the drastic step of reversing a conviction because of prosecutorial misconduct only after a careful balancing of the many interests involved. The weights and counterweights that make up the balance include: the defendant's interest in being tried on evidence validly before the jury; the public's interest in having the guilty punished; the public's interest in not burdening the administration of justice with undue financial or administrative costs; the public's interest that the judicial process shall both appear fair and be fair in fact; and the interest of the individuals involved—the witnesses and family of the victim—not to be subjected to undue trauma, embarrassment or inconvenience.

We conclude that a balancing of the relevant interests in this case weighs against reversal. The defend-

ant received a fair trial; exclusion of the evidence regarding disposal of the knife would not have affected the result. Retrying this defendant would be expensive and further congest an already crowded court system. Furthermore, there are obvious practical difficulties in trying the defendant for a murder that occurred nearly four years ago. Finally, but by no means insignificantly, retrial of this case would be traumatic for those innocently affected by this heinous crime, reviving memories which are better left alone.

By reversing the court of appeals' decision we are not condoning District Attorney Zapf's conduct.[5] Our decision is based on our determination that the balancing of the various interests involved weighs against reversing this conviction.

*By the Court.* The decision of the Court of Appeals is reversed.

---

[5] Under Supreme Court Rule 21.05 attorney misconduct is a matter for the Board of Attorneys Professional Responsibility.